## BROOKHEIM v. GREENBAUM.

### SAME v. HARMS.

#### (District Court, S. D. New York. December 12, 1912.)

1. BANKRUPTCY ☞303—VOIDABLE PREFERENCE—KNOWLEDGE OF INSOLVENCY BY CREDITOR.

Where notes paid by a bankrupt within four months prior to his bankruptcy were then more than a year overdue, during which time he had claimed his inability to pay on the ground of poor business, slow collections, and that he was "broke," and paid at last only on insistent demands, but during all such time continued his business, which was that of a retail dealer in meats, and of considerable volume, as usual, more than the mere fact that he was then insolvent is necessary to charge the creditors with having reasonable cause to believe him insolvent, and that the payments constituted preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. ☞303.]

2. BANKRUPTCY ☞166—VOIDABLE PREFERENCE—KNOWLEDGE OF INSOLVENCY BY CREDITOR.

Something more than suspicion is necessary to put a creditor on inquiry as to the solvency of his debtor, and to charge him with reasonable cause to believe that a payment to him will effect a preference over other creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ☞166.]

In Equity. Suits by Charles L. Brookheim, trustee in bankruptcy of Justus H. Garthe, against Leo Greenbaum and against John Harms. Decrees for defendants.

Decree affirmed, 225 Fed. 763, —— C. C. A. ——.

Lesser Bros., of New York City (William Lesser and James B. Stephens, both of New York City, of counsel), for complainant.

Wesselman & Kraus, of New York City (Bertram L. Kraus, of New York City, of counsel), for defendants.

LEARNED HAND, District Judge. This is a suit in equity by the trustee in bankruptcy of one Justus H. Garthe against Leo Greenbaum, and another suit against John Harms. Each suit is to recover a payment made a few weeks before the bankruptcy by the bankrupt to the defendant in the case, upon the theory that he had reasonable cause to believe that the bankrupt was insolvent.

[1] The trustee has proved beyond any controversy, to my satis-

faction, that the bankrupt at the time the payments were made was insolvent, and for that matter, although it is immaterial in the case, that he knew he was insolvent. So the practical question is whether there was enough notice to put these two defendants upon inquiry when they received payment—an inquiry which would have led them to learn of the insolvency in question. This is a somewhat vexed question of fact, and I am not by any means free from doubt as to what actually took place.

Unfortunately for the trustee, he is obliged in the case to rest upon the testimony of the bankrupt and the two defendants. As to the bankrupt himself, he was in no sense to me a satisfactory witness, and if it was a case of dispute I should hardly accept his testimony against that of any one else. Of the two defendants, Harms impressed me more favorably; but I was not particularly satisfied with either of the witnesses. However, although these considerations are of consequence, where there is a dispute in testimony, it will hardly furnish, in the absence of more definite grounds of inquiries, actual testimony upon which a complainant may rest; and as I have said before in this case the defendant is obliged to rest upon the testimony of the two men who conducted the transaction. While, therefore, I am justified in looking at the transaction with great suspicion, I think I am still obliged to find somewhere in the testimony some evidence on which the plaintiff can base its case. I will therefore take up each transaction separately:

Harms had a restaurant in Park Row, with a hotel. He had been dealing with the bankrupt for 10 or 12 years, buying large quantities of meat and bologna monthly from him. His average purchases up to the date of the transaction in question, which was some time in January, 1911, amounted to about $600 a month. Early in January of that year he sublet his restaurant, and in that way he required much less meat of the bankrupt than theretofore he had. The loan in question that Harms made to the bankrupt was some time in the summer or autumn of 1909. It was at four months, and for $500. Harms had discounted the note given, which was protested on December 16, 1909, and which he had to take up himself. He then went to the bankrupt, or sent for him, and told him that he wanted the money. From that time, and for a whole year or more, he seems to have kept after him, dunning him and pressing him for money; but the bankrupt put him off, saying that his collections were so slow that he had all he could do to pay the dealers from whom he got his meat.

The original reason for the loan, Harms says, was because the bankrupt had told him that he had lost wagons by theft and had suffered general financial misfortune. He had also complained of bad business and of high prices. All these facts the bankrupt himself corroborates. It appears, however, that the bankrupt had continuously done business in an extremely loose way. Until September, 1910, he had never had a bank account. He was accustomed to bring in his customers' checks and pay his bills with them, and to pay cash, and in general to conduct his affairs as no ordinary business man would ever think of doing. Besides that, as appears from the fact of the protest of the note, he had been hard pressed for cash for at least

a year, and yet he had not gone under. The reason for the final payment itself was that Harms, on going out of the restaurant business, told him that he wished him to settle up at once, and said that he must have his money. About the 8th or the 15th of January he came into his restaurant and paid $500, part in checks and part in cash.

The testimony in regard to Greenbaum is somewhat stronger for the complainant than that of Harms, for his relations apparently were more intimate with him. Greenbaum was also a restaurant keeper and dealt largely with the bankrupt. His average purchases were about $1,200 a month. The bankrupt would frequently collect this account in advance by cashing checks with Greenbaum, some of them postdated. He kept telling Greenbaum that he was hard up, and once or twice that he was "broke," explaining this, however, by the statement that his ready cash was so short he couldn't spare any payment, and that he could not afford to take a chance of pressing his customers, else they would leave him. The loan in question had been made in May, 1909, and the note had run along, therefore, for a period of about 20 months, without any payment being made upon it at all. However, during all that time the bankrupt had continued to do business in precisely the same way, always being hard pressed for ready cash, never able to make any payment, although frequently pressed, and yet during the whole time he had remained doing a large business and never becoming insolvent.

There is nothing, it seems to me, in the case of either of the defendants which would justify their belief that at the time they got the money anything different had happened to the bankrupt from what had been happening during all the time they had done business with him. There was nothing to suggest to them that his situation was any different at that precise time from what it had been throughout, and this fact I think is a determining factor in the decision. In most cases of this sort there is something which draws the attention of the creditor to the fact that the bankrupt's financial condition has changed; that it is not now what it was. In this case all the facts which are supposed to put defendants upon notice were in existence at the very time when the loans were made—that is, so far as the rather loose testimony permits me to infer; and for this reason Mr. Lesser quite frankly agreed with me, when I pressed him with the point that, had the payment been made at any time after the notes became due, and had bankruptcy ensued within four months thereafter, there would have been just as much reason to set aside the payment as under the facts in the case at bar.

[2] Now, that being admitted, the longer the situation remained and the bankrupt continued to do business, the more reason had the persons who dealt with him to suppose that, although he was dealing on a very narrow margin and practically had no free capital, he nevertheless was not insolvent. It must be remembered that a man who is always short in cash is only a man who has no free capital. It does not follow necessarily, as both sides concede, that he is insolvent because he is not quick pay. However, the fact that a man in business is not able to pay up when he is pressed in many cases may well be

a ground for inquiry, and even for sufficient suspicion of insolvency to justify a suit like this, as, for example, in the case of a large business conducted with prudence and accuracy; but it does not seem to me that, in the case of a man who concededly did business in such an unbusinesslike way as this bankrupt, shortness of cash and absence of free capital, continuing for so long a period of time without any insolvency, ought to be enough to put on inquiry all those who dealt with him. It must be remembered that something more than suspicion is necessary. Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640; Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971; Sharpe v. Allender, 170 Fed. 589, 96 C. C. A. 104 (C. C. A. 3d Cir.); J. W. Butler Paper Co. v. Goembel, 143 Fed. 295, 74 C. C. A. 433 (C. C. A. 6th Cir.); Re Goodhile (D. C.) 130 Fed. 471. These cases all decide that it is not enough that the bankrupt is in temporary straits and the debt overdue.

Perhaps this would have protected the defendants, even had Garthe's condition been of recent origin; but surely they were entitled to suppose that he might go on for an indefinite time, just as he had gone on up till then, in a kind of hand to mouth existence, like that of so many small traders. A bankruptcy court ought not to say that it is unsafe for any one to deal with such a small trader merely because he is very slow pay, and is always complaining that his collections are slow, that he is "broke," meaning that he has no cash, and that business is bad. Such men very commonly are in that case, and are continually complaining in all those ways, especially when they are being pressed. They pay those from whom they buy, who will not furnish more unless they pay some of what they owe. Others, like these defendants, who had security of sorts in their own purchases from the trader, they put off as long as they can. No one can ever know whether such men could make both ends meet, or not, if they were sold out. Probably they very seldom could do so, but I am sure the act does not mean to say that that kind of knowledge is reasonable cause to suppose that a preference will result. They go on so for years, at times, just as this man did, and perhaps generally they go under in the end; but meanwhile they buy and sell, and evidently pay as they go, until the crash comes. Any premonition that that day is near is enough, I agree; but the mere knowledge that at some time it will probably arrive is not enough. If it is, then these men can never be in business, for no one can safely trade with them.

In the case at bar there was no such indication as far as the evidence goes, though I must confess to some suspicion of the truth of the story as given. If I had merely to guess, I think I should guess with the complainant that they knew more than now appears; but I have no right to guess without some basis. The story of all of them is reasonable enough as it reads, and under it there was no reason at all to suppose at the time of the payments that anything unusual had happened. There was no premonition whatever. Each defendant says that he insisted upon being paid before the holidays. Garthe urged that his trade was good in December, and that his collections would be good in January. This story may be false, but it is not

improbable. His business was such that a payment of $600 or $1,200 was not at all suspicious; it was a large one. He took in every day over the counter $160 or $175, besides his collections, and the defendants had considerable knowledge of his business. Any substantial increase in his collections might easily put him in funds enough to pay at once $1,200.

There is here no evidence of sudden sales, of large payments, or transfers in property, or voluntary payment by the bankrupt, of any visible change in his mode of business, in short, of any of the usual earmarks in such cases. Suspicion will not support a decree by which property is transferred from one man to another.

Decrees dismissed.