## SMITH v. POWERS.

### In re RUDDY & SAUNDERS CONST. CO.

#### (District Court, N. D. New York. February 3, 1919.)

1. BANKRUPTCY ⬤⟿166(4)—PREFERENCE—"REASONABLE CAUSE TO BELIEVE."

"Reasonable cause to believe" a debtor insolvent, and that payments received from him will effect a preference, is not a mere suspicion or surmise, but knowledge of facts of a character calculated to induce a belief in the mind of an ordinarily intelligent and prudent business man.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reasonable Cause.]

2. BANKRUPTCY ⬤⟿166(4)—PREFERENCE—REASONABLE CAUSE TO BELIEVE.

If a debtor is actually insolvent, and means of knowledge of such insolvency are at hand, and facts are known to a creditor receiving payment, which clearly ought to put a prudent business man of intelligence on inquiry, he is charged with reasonable cause to believe.

3. BANKRUPTCY ⬤⟿159—FRAUDULENT TRANSFER OF PROPERTY.

Where a corporation, which was hopelessly insolvent, within four months prior to bankruptcy, sold practically all its property and assets, disabling itself from continuing its business, and with the proceeds paid certain creditors in full, knowing such act would make it impossible for the unpaid creditors to ever get anything on their claims, and intending to accomplish that result, such payments constituted transfers with intent to hinder, delay, and defraud creditors, and under Bankruptcy Act, § 67e (Comp. St. § 9651), are recoverable by its trustee.

4. BANKRUPTCY ⬤⟿184(1)—VOIDABLE TRANSFERS OF PROPERTY—PREFERENCE BY INSOLVENT CORPORATION.

Under Stock Corporation Law N. Y. § 66, providing that no payment made by an insolvent corporation with intent to prefer a creditor shall be valid, and Bankruptcy Act, § 67e (Comp. St. § 9651), providing that all transfers by an insolvent within four months prior to bankruptcy, which are null and void under the laws of the state, shall be null and void, payments made to certain creditors in full of their claims by an insolvent corporation are void, and recoverable by its trustee.

5. CORPORATIONS ⬤⟿543—UNLAWFUL TRANSFER BY INSOLVENT CORPORATION—BONA FIDE PURCHASER.

A creditor, receiving payment in full from an insolvent corporation, which effected an unlawful preference, under Stock Corporation Law N. Y. § 66, is not given the status of a purchaser for value without notice, within the exception in the statute, because of the surrender of a guaranty of his debt by a third person, especially where the guarantor was president of the corporation and made the payment in its behalf.

6. GUARANTY ⬤⟿59—DISCHARGE OF GUARANTOR—PAYMENT BY PRINCIPAL.

To discharge a guarantor, payment by the principal must be a legal and valid one.

At Law. This is an action brought by George K. Smith, as trustee in bankruptcy of the Ruddy & Saunders Construction Company, a bankrupt, against Thomas F. Powers, to recover of him the sum of $18,824.-15, besides interest, paid by said Construction Company to said Powers, or to his duly authorized agent, in payment of certain notes of said company given to or held by said Powers and amounting to $13,824.-15, and in payment for certain legal services rendered by said Powers to said company, amounting to the sum of $5,000, and which payments, it is claimed, were made within four months of the filing of the petition and adjudication in bankruptcy and under circumstances which,

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and with such knowledge on the part of said Powers, as entitles the plaintiff to recover such sums so paid, with interest. Decree for plaintiff.

Danforth E. Ainsworth, John N. Carlisle, and C. B. Sullivan, all of Albany, N. Y., and D. G. Atkins, of Kingston, N. Y., for plaintiff.

Edward Murphy and John T. Norton, both of Troy. N. Y., for defendant.

RAY, District Judge. This action was tried before this court with a jury, and the jury, in answer to written questions submitted to it, found that at the time the Ruddy & Saunders Construction Company paid by its check to Thomas F. Powers the several sums of money shown by the evidence to have been paid in February and March, 1916, aggregating in amount the sum of $18,824.15, said Ruddy & Saunders Construction Company was insolvent, or that its insolvency was imminent, within the meaning of the state statute. The court had found and held as matter of law under the proof that when such payments were made the said company was insolvent within the meaning of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544 [Comp. St. §§ 9585–9656]). This court now finds the above-stated facts in accordance with the finding of the jury and its own holding on such trial.

The court submitted the following question to the jury, and it disagreed, so that no answer was obtained, viz.:

"Were the payments made by the Ruddy & Saunders Construction Company to Thomas F. Powers in February and March, 1916, and made by checks of the said company, signed by the De Lees, or by De Lee and Saunders, and which were made on notes aggregating about $13,824.15, made by the officer of the company making the payment, with the intent on his part of giving a preference to said Thomas F. Powers; that is, with the intent of enabling the said Powers to obtain and retain a greater percentage of his said claim on the notes against the company than other creditors of the said company of the same class would receive?"

The following question was submitted to the jury, and it agreed on and reported an affirmative answer thereto, viz.:

"Were the payments made by the Ruddy & Saunders Construction Company to Thomas F. Powers in February and March, 1916, and which were made by the check or checks of said company, signed by the De Lees, or one of them, and given in payment of the bill of Powers for legal services, amounting to $5,000, made by the officer of the company with the intent on his part of giving a preference to said Thomas F. Powers; that is, with the intent of enabling said Powers to obtain and retain a greater percentage of his said claim of $5,000 for legal services than other creditors of said company of the same class would receive?"

It is seen that the jury drew a distinction between the payments made on notes and those made on account of legal services, and were disagreed as to the first and agreed as to the latter. The notes referred to were given as follows for the following amounts, viz.:

| | |
|---|---|
| June 1, 1915, note | $8,610.00 |
| January 5, 1916, note | 2,000.00 |
| January 19, 1916, note | 1,961.00 |
| January 26, 1916, note | 800.00 |

The payments on said notes were made as follows: February 8, 1916, $1,001.70, and February 29, 1916, $12,822.45.

The legal services were rendered at various times after the organization of the company, but the payments were made as follows, viz.: March 1, 1916, $4,000; and March 2, 1916, $1,000. It is seen there could not, probably, have been much change in actual conditions between February 29, 1916, when the last payment on notes was made, and March 1, 1916, when the large payment on legal services was made; but, of course, much information might have been obtained in one day, or two days, or even in a few hours. In fact, there was no substantial change in conditions between the 29th day of February, 1916, and the 2d day of March, 1916. Powers knew March 1 that he had received from the now bankrupt $12,822.45 on the 29th of February, and knew of the other payments which preceded the final one of March 2, 1916.

The following question was also submitted to the jury for answer, viz.:

"At the time of the several payments of money by the Ruddy & Saunders Construction Company to Thomas F. Powers, the defendant here, in February and March, 1916, amounting to $18,824.15, did said Powers have reasonable cause to believe that such payments (that is, the payment of such sums of money made by check) and the retention of same by Powers would effect a preference; that is, enable said Powers to obtain a greater percentage of his debt than any other of the creditors of said company of the same class, first, when checks were given in payment of notes; and, second, when checks were given in payment for legal services?"

As to whether or not Powers had such reasonable cause to believe, when checks were given in payment of notes, the jury was unable to agree, but the jury found that he did have such reasonable cause to believe when the checks were given in payment for legal services. Here, again, we have the same distinction drawn by the jury between the payments on the notes and payments for legal services.

Another question was and is involved in the case. It was and is claimed by the defendant, Powers, that when he made the first loan to the company he declined to make it without some sort of security for it and other contemplated loans, and that one Patrick E. De Lee, who was and is financially responsible, and who was interested in the company in a way, agreed to give and did give to him his written personal guaranty of payment of such first loan, and of such loans as he should make the company thereafter, and that, when payment of the notes was made and completed, he, shortly thereafter, surrendered and canceled such guaranty. This was and is denied by the plaintiff, and hence the following question was submitted to the jury, but it was unable to agree thereon, viz.:

"Did Patrick E. De Lee, at the time he borrowed the first money in question here, $4,000, July 31, 1914, execute and deliver to Thomas F. Powers, the defendant, his written guaranty that he would personally pay and be responsible for all sums of money the said Thomas F. Powers then loaned and thereafter might or should loan to the said Ruddy & Saunders Construction Company, now bankrupt, and did said Powers thereafter, and after payment to him of the several notes held by him executed by said company, in consideration and because of such payments, surrender such written guaranty to said Patrick E. De Lee?"

On this question of fact presented by this question I think the proof is with the defendant, and I find such written guaranty was given and surrendered at the time stated. The legal effect, if any, will be considered later.

The Ruddy & Saunders Construction Company, now the bankrupt, was organized about October 20, 1910, and existed under and pursuant to the laws of the state of New York, and had its principal place of business at Troy, Rensselaer county, N. Y., but carried on and did business in other places, in the construction and repair of state roads mainly, if not wholly, and it purchased machinery, tools, and implements for carrying on such work. Mr. Powers, the defendant, was and is an attorney at law, residing at Troy aforesaid, and he acted as attorney for the said company in regard to its organization and its suits, but claims he had nothing to do with the control or management of its financial affairs, and was not acquainted with its financial management or condition, and had little, if any, substantial information or knowledge regarding same. He insists that he did not know of its financial condition, or that it was seriously involved financially, before or at the time he received the payments above stated and referred to, and claims he had no reasonable cause to believe it was insolvent, or that the receipt and retention of such payments by him, or any of them, would result in his receiving a greater percentage of his debt or debts and claim or claims than other creditors of the said company of the same class would receive. The defendant claims he was sick when the payments, or the main ones, were made, and that he had not had occasion to inquire into the financial affairs or condition of the company, and that nothing had occurred to put him on inquiry.

The plaintiff, on the other hand, insists that the evidence discloses such a state of facts as must have brought home to his knowledge the financial condition of this company, or, at least, must have put him, as a reasonable man, of not only ordinary intelligence, but of much more than ordinary intelligence, and one of legal learning, on inquiry, and that he was and is chargeable with the information he actually had, and such as he might and would have obtained, had he made inquiry. The plaintiff claims that Mr. Powers had to do with and took an active part in the organization of this company, and knew its only capital was limited to $10,000; that at the dates mentioned he was called upon by it to loan it money to carry on its business, and that such requests for loans were frequent between June 1, 1915, and January 26, 1916, three of them being in January, 1916, and amounting to $4,761, and when that made June 1, 1915, of $8,610 had not been paid; that Mr. Powers also knew the fact that the company had no credit with the banks, and had been denied loans by the banks in Troy and Albany; that Mr. Powers knew that one or more of these loans made by him was sought and made to enable the company to meet its pay roll; that in at least one instance the company was sued, and Mr. Powers had to do with the settlement of the suit; that the defendant, Mr. Powers, had such knowledge of the financial condition of the company that he refused to make to it the loans of money re-

quested without the personal obligation and security of the father of some of those composing the company and with whom he was on terms of friendly intimacy; that in the winter and spring of 1916 Mr. Powers several times requested, and even demanded, payment of the moneys due him; that his account for legal services alone had then run up to some $5,000; that Mr. Powers knew, when he was demanding payment, that the company had not theretofore been able to pay either the notes or account for services, and that the payment of such large sums of money in such quick succession must put a heavy financial burden and drain on the corporation, and that his insistence showed a distrust of and lack of confidence in its financial ability, soundness, and responsibility; that a little inquiry would have disclosed the entire situation, and would have shown what was the fact, that to make these payments and others which were made the company was selling substantially all of its disposable property, machinery, tools, claims, and accounts, including the money which had been reserved by the state as security for the soundness of work done for it, and was in fact disabling itself from doing further business, and that in this way it had reduced its only remaining assets to about $5,000, and left over $30,000 of its indebtedness unpaid and unprovided for.

The evidence shows, and I must find, that this company did dispose of its property as stated, and did pay certain of its creditors, not including Mr. Powers, to the amount of over $20,000, to the exclusion of others, and that at the time of its bankruptcy its only property remaining did not exceed $5,000 in value, and that its then remaining unpaid and unsecured indebtedness was in excess of $30,000. That the corporation was insolvent, and knew it was insolvent, within the meaning and intent of section 66 of the Stock Corporation Law of the state of New York (Consol. Laws, c. 59), and within the meaning and intent of the national bankruptcy Act, is fully established by the evidence and beyond controversy. It is also fully shown that the officers of this company intended, when the payments to Mr. Powers and others were made, and when it so disposed of its property and turned the same into money, to pay certain of its creditors in full to the exclusion of other of its creditors of the same class. This intent was carried out. The officers are presumed to have intended the natural and well-known consequences of their own acts, knowingly done.

[1] Reasonable cause to believe is not a mere suspicion or surmise, but knowledge at the time of facts of a nature or character calculated to induce a belief in the mind of an ordinarily intelligent and prudent man that the payments made would work and effect a preference; that is, facts calculated to induce a belief that the person or corporation making them was insolvent within the meaning of the law, owing debts he or it was unable to pay in full, and that he, the person securing the payments or payment made, was getting his pay in full (in this case) when others of the same class would only receive a part of their just claims. A person has reasonable cause to believe when such a state of facts is brought to his notice and attention respecting the affairs and pecuniary condition of his debtor as would lead a prudent business man of intelligence to the conclusion

that the debtor was then insolvent, and that the payment then made to him (such creditor) would, if retained, operate to give him a greater percentage of his debt than other creditors of the same class would receive.

[2] If a person or a corporation is actually insolvent (within the meaning of the law) when a payment or payments are made to one or more creditors to the exclusion of others, and the means of knowledge of such insolvency are at hand and ascertainable on reasonable inquiry, and such facts and circumstances were known to the creditor receiving the payment as clearly ought to have put a prudent business man of intelligence on inquiry, he is charged with reasonable cause to believe if it also appears that he might, by reasonable activity and inquiry in informing himself, have ascertained the fact that the receipt and retention of such payment would operate to give him a greater percentage of his claim than other creditors of such debtor of the same class would receive. There must be either actual knowledge, or knowledge of such facts and circumstances as would put a reasonable man of ordinary intelligence on inquiry under circumstances where, if he did inquire, he might and probably would obtain the necessary knowledge. The above statements as to the law are sustained by the following cases, and others: Grant v. National Bank, 97 U. S. 81, 24 L. Ed. 971 (under act of 1867); Nichols et al. v. Farmers', etc., 225 Fed. 689, 140 C. C. A. 563; Brookheim v. Greenbaum (D. C.) 225 Fed. 635, affirmed 225 Fed. 763, 141 C. C. A. 89 (C. C. A. 2d Circuit); Rosenman v. Coppard, 228 Fed. 114, 142 C. C. A. 520 (C. C. A. 5th Circuit, citing Grant v. National Bank, supra); Aronin v. Security Bank of N. Y., 228 Fed. 888, 143 C. C. A. 286; In re States Printing Co., 238 Fed. 775, 151 C. C. A. 625; In re Gaylord (D. C.) 225 Fed. 234.

We are led to inquire, therefore, in determining whether or not Mr. Powers had reasonable cause to believe that the corporation was insolvent, and that the receipt by him of the moneys paid on the notes and account for services and the retention thereof would operate to give him a greater percentage of his claim or claims than other creditors of the company of the same class would receive, just what knowledge the evidence shows he did have and what the circumstances and surroundings known to him were. He drew the incorporation papers of the Ruddy & Saunders Construction Company, and knew the amount of its capital stock paid in, and that it was $10,000 only. He knew the business in which the company was engaged, and that the purchase of machinery, tools, etc., was necessary to carry on that business. He was friendly with the De Lees, who were interested therein, and had done business for at least one of them, the father. He knew that the company had trouble at the bank where it was doing or had done business, and could not obtain credit there, as it desired at least, and that it came to him for loans of money aggregating at least $13,000, and which loans were made at different times and in various sums, and that they were not paid when due, and that some of the later loans were made after a demand for payment of prior loans, which request for payment had not been complied with.

He knew there were eight or ten banks in the city of Troy alone. The defendant says the first loan he made to this construction company was July 31, 1914, for $4,000, and says of his talk with De Lee when the loan was made:

"I think he said something about having some trouble with the bank; that is the reason he wanted to borrow it. * * * I haven't any distinct recollection. He had asked for some loans, I think it was, and they had refused to loan him to the extent he wanted."

This was, of course, notice that this company could not get a loan of $4,000 at the bank where it had done business. Mr. Powers made no inquiry at this time into the financial condition or situation of the company, but did exact a paper from the father pledging his individual credit for not only that loan, but any subsequent loans he might make the company, and says that De Lee, the father, stated that—

"He had some trouble with the bank, and he said he had to raise money to carry on his business, and they got money from time to time from the state, and he would pay off this indebtedness just as he had been in the habit of paying them off at the bank."

For that loan, made July 31, 1914, Mr. Powers took the note of the company, also the separate guaranty signed by the father. Mr. Powers says he supposed the company was getting estimates from the state from time to time. May 12, 1915, Mr. Powers loaned this company $2,500 more, and June 12, 1915, $3,000 more, making a total of $8,500. Mr. Powers says that, instead of paying him as the company received estimates from the state, it borrowed this additional money, and that when he made the loans he made no inquiry as to the assets or affairs of the company. Mr. Powers further says that in January, 1916, he asked Mr. P. E. De Lee for payment, and that at that time the company was owing him the $8,610 note and nearly $5,000 for services; the last charge for services to make up the $5,000 having been made January 13, 1916. Mr. Powers says De Lee said they would pay him soon, but that he made no further inquiries. A few days later the company borrowed $2,000 more, and he made no inquiries. Within four days thereafter Mr. Powers loaned the company $1,000 more, and he made no inquiries. Then January 24, 1916, he loaned the company $800 more, the prior loans not having been paid, and he made no inquiries. Then February 1, 1916, Mr. Powers loaned the company $1,000 more, and made no inquiries. Mr. Powers says on one of these occasions De Lee said he wanted the money for pay rolls for the men, but he did not ask what he wanted it for on other occasions. The payments on notes between February 8, 1916, and February 29, 1916, aggregated $13,824.15, and those on legal services were made March 1, 1916, $4,000, and March 2, 1916, $1,000. Mr. Powers says he was confined to his room when the payments were made as does his stenographer, and that she indorsed the checks and deposited them to the credit of Mr. Powers. Mr. Powers says he was informed of the payments the same day when made, or the next day, and hence he had no talk or communication with the one making the payments.

There is nothing to contradict this testimony, and hence there is no evidence of knowledge gained by Mr. Powers at the time the payments were made. On this branch of the case his knowledge must be found from what had transpired before that time. In addition to what has been stated, it appears that Mr. Powers, during all this time from the organization of the company, had been its attorney in all its litigated suits, and had paid and settled one suit on a claim on a money demand against it. It is insisted by the plaintiff that these friendly relations between the parties, coupled with the relation of attorney and client, the loans of money as stated under the circumstances stated and for the purpose named, so far as appears, and the fact that this indebtedness had increased or run up to $18,000 without payment of any part, and the further fact that the company had been sued on at least one money demand, show that Mr. Powers, as an intelligent man and attorney, was put on inquiry—was put in possession of knowledge of facts and circumstances which called upon him to make inquiry and which indicated financial embarrassments.

It seems improbable and almost incredible that Mr. Powers, considering the friendly relations, the close relations of attorney and client, and frequent requests for loans without any payment, would make these large and frequent loans of money, and not inquire or be consulted about or in reference to the business or financial condition of the company. With such relations existing, it would seem not only natural, but probable, that the officers of the construction company would consult as to its financial and business relations and conditions with Mr. Powers, its general attorney in all litigated suits, and who was intimate and friendly with some of the members of the company. On the other hand, it may be argued that under such circumstances the officers of the company would be desirous to conceal the actual conditions from Mr. Powers, and would do that, and that Mr. Powers, relying on the written guaranty of P. E. De Lee, would feel perfectly safe, and not deem himself called upon to make any inquiries whatever, or under any necessity for doing so.

[3] We come to another question in this case, and one which to me seems decisive under the proven facts, and which stand substantially uncontradicted.

The indebtedness of the Ruddy & Saunders Construction Company was in excess of $70,000 at the time these notes and the account for legal services due to Mr. Powers were paid. Its total assets of every name and nature, kind, and description did not exceed $40,000 or $45,000 in value. The company was insolvent in fact; that is, its property and assets of all kinds was insufficient by more than $25,000 at any fair valuation to pay its indebtedness, and it had been doing business at a loss. It was owing thousands of dollars on notes and other demands past due, which it was unable to pay. Some, if not all, of the notes due Powers were past due, and demand of payment had been made, and payment had not been made, although promised. To do and continue business it was necessary for this company to have machinery and tools—we may say, suitable equipment. The company, by its officers, knew all these facts. With this condition of

affairs existing, and to meet or pay such of its obligations as it desired to pay, when paying some of its creditors to the necessary and inevitable exclusion of others of its creditors, this corporation, the now bankrupt, collected in everything due it, sold some of the demands due it at a considerable discount, sold moneys due it from the state, but withheld as security for the soundness of work done under its contracts, and also sold and disposed of substantially all its other personal property, including machinery, tools, etc. (it had no real estate), and in so doing disabled itself from carrying on its business or performing its contracts. It retained some tools, etc., worth perhaps $3,000 to $5,000, and allowed some of its employés in one of the down river counties to continue work for a time, but never paid them. With the proceeds of these collections and sales the company paid Mr. Powers some $18,000, to other creditors, largely friends, about $20,000, and left creditors, including about $3,000 of labor claims, entirely unpaid and unprovided for. All this, this company, through its officers and managers, well knew. There was some attempt to claim that it hoped, and even expected, to continue its business, and that it expected to perform certain outstanding contracts from which it would derive profits and be able to pay its remaining creditors. The evidence shows beyond question that the officers and managers of the company had no such real hope and no such expectation or purpose, but intended to go out of business as it did. I must and do find that in so converting its property into money and disposing of it, and when it did so, it acted, as did its officers and managers, with the purpose and intent of giving a preference to the particular creditors so paid and to the exclusion of those not paid. This was the direct and inevitable and well-known effect and consequence of what the company and its officers and managers did.

Section 67e of the Bankruptcy Act of 1898, as amended (Comp. St. § 9651), provides as follows:

"That all conveyances, transfers, assignments, or incumbrances of his property or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration; and all property of the debtor conveyed, transferred, assigned, or incumbered as aforesaid shall, if he be adjudged a bankrupt, and the same is not exempt from execution and liability for debts by the law of his domicile, be and remain a part of the assets and estate of the bankrupt and shall pass to his said trustee, whose duty it shall be to recover and reclaim the same by legal proceedings or otherwise for the benefit of the creditors. And all conveyances, transfers, or incumbrances of his property made by a debtor at any time within four months prior to the filing of the petition against him, and while insolvent, which are held null and void as against the creditors of such debtor by the laws of the state, territory, or district in which such property is situate, shall be deemed null and void under this act against the creditors of such debtor if he be adjudged a bankrupt, and such property shall pass to the assignee and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt. For the purpose of such recovery any court of bankruptcy as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

[4] It is claimed by this plaintiff that these transfers of its property made by the company with the intent stated were and are void under the provisions of section 66 of the Stock Corporation Law of the state of New York, and that the plaintiff may recover same under the provisions of section 67e of the Bankruptcy Act, above quoted, expressly that part wherein it is provided as follows:

"And all conveyances, transfers, or incumbrances of his property made at any time within four months prior to the filing of the petition against him, and while insolvent, which are held null and void as against the creditors of such debtor by the laws of the state, territory, or district in which such property is situate, shall be deemed null and void under this act against the creditors of such debtor if he be adjudged a bankrupt, and such property shall pass to the assignee (trustee) and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt."

If these transfers of money to these creditors, or those made to the defendant Thomas F. Powers by this company in payment of notes and the account for legal services, were and are void under the provisions of section 66 of the Stock Corporation Law of the state of New York (Consolidated Laws of N. Y. 1909, vol. 5, p. 5782), then the plaintiff, as trustee in bankruptcy of the now bankrupt company, may reclaim and recover the same for the benefit of the creditors of such bankrupt, unless the surrender by Powers of the written guaranty above referred to, after the payment of such notes and accounts, operates to defeat such right of recovery. Section 66 of the Stock Corporation Law, so far as necessary to recite same here, reads as follows:

"No conveyance, assignment or transfer of any property of any such corporation [one that has refused to pay any of its notes or other obligations, when due, in lawful money] by it or any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid, except that laborers' wages for services shall be preferred claims and be entitled to payment before any other creditors out of the corporation assets in excess of valid prior liens or incumbrances. * * * Every person receiving by means of any such prohibited act or deed any property of the corporation shall be bound to account therefor to its creditors or stockholders or other trustees. * * * Every transfer or assignment or other act done in violation of the foregoing provisions of this section shall be void."

Under the provisions of section 67e of the Bankruptcy Law (30 Stat. 564, and 32 Stat. 800), and those of section 66 of the Stock Corporation Law of the state of New York, above quoted, it is immaterial what the intent and purpose of Mr. Powers was, and whether or not he knew of the insolvency of the construction company, and had reasonable cause to believe the receipt and retention by him of the payments made would operate as a preference. Grandison v. Robertson et al., 231 Fed. 785, 790, 145 C. C. A. 605, 610 (C. C. A. 2d Circuit). The Circuit Court of Appeals said and held:

"It is to be observed that under the Bankruptcy Act a preferential payment, to be voidable, must have been received by one who had 'reasonable cause to believe' that it would effect a preference; while under the New York Stock Corporation Law the invalidity of the payment is not made to depend upon the

knowledge of the one receiving the payment that it is a preferential payment, or upon his having reasonable cause to believe that it is a preferential payment. It depends upon whether the corporation or its officers in making the payment did so with the intent of giving a preference to any particular creditor over other creditors. Under the New York statute the invalidity of the payment is conditioned on two facts: (1) The corporation must have been at the time of payment insolvent, or its insolvency must have been imminent. (2) The payment must have been made (not received) with the intent of giving a preference to a particular creditor over other creditors of the corporation."

When the payments to Powers were made, the Ruddy & Saunders Construction Company was hopelessly insolvent, and it and its officers and managers well knew the fact, and the payments were made to Mr. Powers with the intent and purpose on the part of said company and its officers and managers making the payments of giving a preference to that particular creditor over other creditors of the corporation. It is immaterial on this branch of the case what the knowledge or intent of Mr. Powers was.

[5] Did the surrender, after the notes were paid, to Mr. Patrick E. De Lee of his written guaranty, held by Mr. Powers, operate in any way to defeat recovery by this plaintiff? The notes were not indorsed by Mr. De Lee, or by any one. The guaranty was a separate written instrument, and read as follows:

"For value received I guarantee the payment to Thomas F. Powers of all loans now or hereafter made by him to the Ruddy & Saunders Construction Company."

It was signed by Patrick E. De Lee.

The Stock Corporation Law referred to also provides:

"No such conveyance, assignment or transfer shall be void in the hands of a purchaser for a valuable consideration without notice."

The defendant, Mr. Powers, cites Perry v. Van Norden, 192 N. Y. 189, 84 N. E. 804, as authority for the proposition that, having surrendered this written guaranty after payment of the notes, he has lost his security in consideration of other property transferred to him by the insolvent corporation, and that he comes within the status or position of "a purchaser for a valuable consideration without notice."

In Perry v. Van Norden, supra, the trust company, defendant, held three notes of a hat company, not due, all indorsed by one F., who was and continued to be perfectly responsible financially. The hat company deposited $1,000 cash with the trust company and borrowed $3,000 of it on its promissory note, secured by an assignment of certain of its assets and accounts. With the $4,000 it then paid and took up its notes first mentioned before due, and by such act released the indorser on the notes, as they were never presented for payment or protested. By and because of this transfer of such assets and accounts the hat company became insolvent and was thrown into bankruptcy, and the trustee sued the trust company to recover the value of such accounts and assets so transferred. The Court of Appeals said:

"We have doubts whether the intent of the hat company in this transaction was to prefer the appellant [the trust company]. The latter was not affected by the exchange so long as the indorser was responsible. The object and result of what was done was doubtless the protection and relief of the indorser."

The court also held that the trust company—

"did not at the times mentioned know or have cause to believe that said company [hat company] was insolvent, or have any knowledge or notice of any intent on the part of said company or its officers to give a preference, nor did it have any intent to acquire a preference."

The court then held that under such circumstances the trust company was not subject to the provisions of the statute prohibiting preferences, but was within the protection of those other provisions enacted for the benefit of purchasers for a valuable consideration and without notice. The purpose and intent of the hat company is perfectly plain. It was desired to release the indorser, and this was accomplished by a deposit of $1,000 and the substitution and discount with the trust company of the unindorsed note of the hat company for $3,000, secured by the assignment of the accounts and assets of the hat company and the use of such deposit and proceeds of such new note to take up the old notes. By this transaction the trust company was secured and the indorser released at the expense of the general creditors of the hat company. The liability of the indorser was contingent only. The notes had not become fixed liabilities against the indorser, and he received nothing. As the old notes were surrendered and canceled before due, they could not be presented for payment and payment demanded, and this was not done, and there was no protest, and hence the trust company had lost all claim against the indorser, who took no part in the transaction. The court further said:

"Before this action was commenced all of said notes taken up as aforesaid had become due, and, of course, they were not by the appellant [the trust company] presented for payment or protested, and so far as appears *the indorser was not a party to the transaction* whereby they were taken up and protest lost, and no offer has been made to restore to appellant its original rights with respect to said notes."

In the instant case there was no indorsement of the notes and no right of protest lost. Nor has there been any loss of right of action on the part of this defendant, Powers, against De Lee, who executed the guaranty. De Lee has not paid anything, or lost anything, or surrendered any right he had against any one. Certainly Mr. Powers gave no consideration to the Ruddy & Saunders Construction Company, except as he surrendered the notes when paid; but this does not make him a purchaser for a valuable consideration without notice. If Powers became, or came into the position of, a purchaser for a valuable consideration without notice, it was for the reason he surrendered his notes on receipt of the moneys due and unpaid thereon, and *also surrendered the written guaranty of Mr. De Lee, and by such surrender lost all right of action against him.* In other words, was there a good and sufficient, or an adequate, valuable considera-

255 F.—38

tion given by Powers for such transfer of the money of the corporation to him?

[6] As a general rule the guarantor is discharged by the payment and satisfaction of the debt guaranteed. But to discharge the guarantor the payment must be a legal and a valid one. *"But the payment must be valid and binding in order to release the guarantor."* 20 Cyc. 1475. In Maxfield v. Jones, 76 Me. 135, it was held that where notes were paid by a sale of property, and in bankruptcy proceedings the sale was declared void; the consideration for the surrender of the notes had failed. If the payment is made by giving a forged note in place of the original, the guarantor is not released. Bass v. Inhabitants of Wellesley, 192 Mass. 526, 78 N. E. 543; Allen v. Sharpe, 37 Ind. 67, 10 Am. Rep. 80; Kincaid v. Yates, 63 Mo. 45; Bank v. Buchanan, 87 Tenn. 32, 9 S. W. 202, 1 L. R. A. 199, 10 Am. St. Rep. 617. So, if the payment is made with the obligation of one under such a disability that the new obligation cannot be enforced, the guarantor is not released. Godfrey v. Crisler, 121 Ind. 203, 22 N. E. 999. So "the payment of the debt by the principal to discharge a debt must be a *valid* payment in order to release the guarantor." Winsted Bank v. Webb, 39 N. Y. 325, 100 Am. Dec. 435. See 4 N. Y. Annotated Digest, 185. In this last case payment was made of six valid notes by the giving of six notes which were void for usury, and it was held that the indorsers on the original notes were not discharged by such payment, although the original notes were surrendered and canceled. See, also, Lee v. Peckham, 17 Wis. 383.

Clearly the payments to Mr. Powers were not valid payments. They were made by the construction company in direct violation of law, of both the Stock Corporation Law of New York, supra, and of the Bankruptcy Act, which latter declares, as stated in subdivision "e" of section 67, that transfers of property made or given by a person adjudged a bankrupt within four months prior to the filing of the petition, and these payments or transfers were so made, with the intent or purpose on his part to *hinder, delay,* or defraud his creditors, or any of them, shall be null and void as against the creditors of the debtor, except as to purchasers in good faith and for a *present fair* consideration. These payments of money constituted transfers of property, and were made with the intent specified, and there was no *present* consideration.

In addition to the Maine case, cited above, we have English cases directly in point. In Petty v. Cooke, L. R. 6 Q. B. 789, the defendant, on the face of the note was a maker, but in fact he was surety only. The note was paid by the principal, but in bankruptcy proceedings he was compelled to surrender such payment. It was held the surety was not discharged and was liable to the holder of the note. In Pritchard v. Hitchcock, 6 Man. & Granger 151, 46 Eng. C. L. R. 149, the defendant in a separate agreement guaranteed the payment of two bills of exchange. The acceptor thereof paid the money due the plaintiff. Later these payments were set aside as constituting fraudulent preferences. It was held the guarantor was not discharged by such

payment, and that plaintiff could recover of the guarantor. The court said:

"Of the fact of money being passed as a payment there can be no doubt; but I think the plaintiff was at liberty to show that what appeared at the time to be a good and satisfactory payment was perfectly illusory; that the money which he had received from W. Hitchcock could not be appropriated by him to his own use, but that it belonged to the assignees."

Stearns on Suretyship (2d Ed.) 136, after stating the general rule that payment discharges the surety, says:

"While this proposition is self-evident, yet it must be observed that, in contemplation of law, nothing amounts to payment or satisfaction which has no value, and if that which is taken in payment is not that which it purports to be, or the use or retention of it is prohibited by law, or for any reason becomes a nullity, then the so-called payment or substitution is not a satisfaction of the original contract, and in the absence of actual or constructive waiver of these infirmities in the medium of payment, *the original contract, although surrendered, will be revived, and the liability of the surety or guarantor restored.*"

In this case the evidence shows, and I find: (1) That Patrick E. De Lee was a stockholder in this construction company, and from 1912, certainly, down to March 1, 1916, was its president, and signed its checks as such, and borrowed money for it of different banks when he could get it, and also of several different persons, including all these loans made by Mr. Powers, for the payment of which latter he gave this written guaranty, when unable to borrow further at the banks; that Patrick E. De Lee, as president, signed the checks for payments down to March 1, 1916, and knew the financial condition of the company of which he was president, and of which his son, John E. De Lee, was general manager, and its insolvency; that he knew that Mr. Powers was being preferred by the payments made by the company to Powers, and intended to prefer him, and also knew that he (De Lee) would be benefited by such preferential payments if they stood; and that Patrick E. De Lee was not an innocent party in such transactions.

In the Van Norden Case, supra, the court took pains to state that—

"So far as appears the indorser [who was released] was not a party to the transaction whereby they [the notes] were taken up and protest lost."

Just what or how much importance the court gave to this fact it is impossible to know, as the Court of Appeals says nothing further on that subject; but it is fair to assume the fact stated had to do with the decision made and was regarded as important, else the statement would not have been made. In the instant case, as we have seen, Patrick E. De Lee, who gave the guaranty, and who, it is claimed, was released therefrom, did have to do with and was a party to the transactions whereby the guaranty was taken up or surrendered and destroyed. However, I do not think this fact necessarily changes the legal aspect of the case, as the payments to Mr. Powers were not valid payments, and no act necessary to bind De Lee on his guaranty was omitted, and he remains bound thereby. His knowledge and partici-

pation, however, has much to do with the equities of the case. I think his participation in the transaction and knowledge of the facts prevent his claiming that the guaranty became inoperative. When Mr. Powers refunds to the estate in bankruptcy the sums received by him, he can recover of Patrick E. De Lee, the guarantor, whose rights have in no way been impaired. Mr. Powers will have no difficulty in establishing the guaranty, as Mr. De Lee testified he gave it, and that it was only surrendered because of the payments made by the construction company to Mr. Powers.

I am requested to find, not only that Mr. Powers had actual knowledge of the insolvency of the Ruddy & Saunders Construction Company at the time he received such payments, and even before, but that his participation in the organization of the corporation and his knowledge of the amount of its capital stock; knowledge of litigations in which he earned $5,000 doing trial work for the company in its litigations; knowledge of the fact the corporation was unable to obtain such loans as it desired at the bank; the frequent and large loans the company obtained of Mr. Powers and his knowledge of the purpose of some of them; the fact that such loans were not paid on request or demand, but were increased thereafter as stated; the fact that his bill for services, and no part thereof, was paid during a term of years; his knowledge that the company had once been sued on a just and valid claim, which Mr. Powers paid for the company; and his knowledge of the fact that when he made the first loan of $4,000 to the corporation he declined to make it without the personal guaranty of Patrick E. De Lee for that and subsequent loans, which the guaranty itself shows were contemplated—gave to Mr. Powers such knowledge and information as to the financial status of the corporation as would put a man of ordinary prudence and intelligence, saying nothing of a skilled and experienced attorney, familiar with the law, on inquiry, and that if he had inquired, as was his duty, he would have received and had actual knowledge of the fact that such corporation was insolvent immediately before the payments were made, and therefore at the time the payments were made, and that he was and is therefore chargeable with knowledge of such insolvency and of the fact that the receipt and retention of such payments would operate as a preference; that is, operate to give to him a greater percentage of his claims than other creditors of the company of the same class would receive.

The difficulty in so finding is that there is no proof that Mr. Powers knew of the amount of the indebtedness of the corporation, or that it was large, and the proof is he was confined to his room when the payments were made, and hence was unable to make inquiries at those particular times. Still he knew of each of them within a day or two, and his agent, who received the payments, and had authority to do so, and to indorse his name on the checks, and deposit same, might have inquired; but there is no evidence that she had reason to inquire. As I view the case, it is unnecessary to pass on that question. These payments were made by the bankrupt company in direct

violation of section 67e of the Bankruptcy Act; that is, first, in violation of section 66 of the Stock Corporation Law of the State of New York, and, secondly, the transfer of these sums of money to Mr. Powers in payment of pre-existing debts were made and given by this bankrupt company, so adjudged on the 24th day of April, 1916, on petition filed April 9, 1916, with the intent and purpose on its part to hinder, delay, and defraud its creditors, who were left unpaid, and Mr. Powers was not a purchaser in good faith and for a *present* fair consideration. The payments were made to a favored few of the friends and relatives of the corporation, or its officers and stockholders, and to its attorney, who was a close friend of the former president, who was the father of other stockholders. It was the intent and purpose to pay some in full and leave others entirely without payment, who were equally entitled to consideration. To do this the corporation stripped itself of all its available assets and voluntarily disabled itself from doing further business. The careful selection of those who were paid to the exclusion of others plainly shows an intent and purpose to so dispose of the property of the corporation as to make it impossible for those unpaid ever to obtain payment of their claims.

Coder v. Arts, 213 U. S. 223, 239, 245, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008, very clearly points out the difference between transfers of property, voidable and recoverable by the trustee, because constituting preferences, and those void and recoverable because made with intent to hinder, delay, or defraud creditors, or some of them. The property and assets of a corporation constitute a trust fund in the hands of its officers and directors, first, for properly conducting and carrying on its business; second, for the payment of its creditors, and all its creditors, pro rata, unless some be entitled to preference; and, third, for payment of the balance, if any, on dissolution to its stockholders. This is the general law, and in effect the statute law of the state of New York. This now bankrupt was a corporation subject to the applicable statutes, and any designed and intended disposition of the money and property of this corporation by its officers, they knowing its insolvency and inability to pay all creditors, and intending to put it out of business, contrary to and in violation of those statutes, for the purpose of paying certain creditors, favored by such officers of the corporation, to the exclusion of other creditors, who stood on an equal basis in law and equity, constituted a transfer of its property with intent to hinder, delay, or defraud its creditors, or some of them, within the meaning of section 67e of the act. If this is not so, we have here a new kind of fraud on creditors, a new mode of disposing of property, which, while it actually hinders and delays, and also defrauds, certain creditors, does not constitute a hindering, delaying, or defrauding of creditors, within the meaning and intent of the Bankruptcy Act, for the reason it is a new kind of fraud.

I think the courts ought to be able in affording remedies, to keep pace with those bankrupt concerns which seek to evade the provisions

of the statute, when the words and plain intent of the statute cover and reach the acts done. With the creation of numerous corporations has sprung up the necessity for and the enactment of many new statutes defining the duties, etc., of their officers, and defining what acts shall be and what shall not be lawful. When acts in violation of such statutes are done by such officers with intent to hinder and delay or defraud creditors, or some of them, such unlawful and injurious acts should come under the terms and words of the statute, when clearly they come within its intent and spirit. In short, it seems to me that a conveyance by a corporation of substantially all its property, after converting it into money, not in due course of its business, but in destruction of its business, to certain favored creditors, to the exclusion of other creditors, and in violation of the statutes of the state forbidding such preferences and transfers, all being intended, and such being the purpose, constitutes a transfer of property made to hinder, delay, or defraud creditors. This is the language of the statute, and clearly the unpaid creditors to the extent of over $30,000 are hindered and delayed in the enforcement of their just claims. I am, of course, mindful of the fact that at common law mere preferences are lawful, and under the decision of Coder v. Arts, supra, a mere preference is not a hindering or, a delaying or a defrauding of creditors, or any of them. But such is not this case.

There will be a decree in favor of the plaintiff and against the defendant for the sum of $18,824.15, with interest on $1,001.70 from February 8, 1916, interest on $12,822.45 from February 29, 1916, interest on $4,000 from March 1, 1916, and on $1,000 from March 2, 1916, with costs and disbursements to be taxed by the clerk. There will be a provision in the decree to the effect that Mr. Powers may prove his claims on all such notes and on the account for services, and that his dividend be ascertained as nearly as possible, and that he only pay the amount due, less such dividend.