## EVERETT v. WARFIELD MINING CO.

Circuit Court of Appeals, Fourth Circuit.
January 14, 1930.

No. 2894.

George S. Wallace, of Huntington, W. Va. (S. A. Headley, of Cincinnati, Ohio, on the brief), for appellant

Randolph Bias, of Williamson, W. Va., and Douglas W. Brown, of Huntington, W. Va., for appellee.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge. On November 22, 1922, the Williamson Pond Creek Coal Sales Company paid to the Warfield Mining Company $16,000 on account. Within four months thereafter the coal sales company was adjudged bankrupt, and, upon the mining company's filing a claim for the balance due it, this $16,000 payment was attacked as a

preference. The referee held that it was a preference, but this holding was reversed by the District Judge, and the trustee has appealed.

The $16,000 was paid to appellee under the following circumstances: In September preceding the payment a written contract had been entered into providing that bankrupt should handle the entire output of appellee's mines, and by the 20th day of each month should make payment for the coal shipped during the preceding month. On November 20th there was due for coal shipped during the month of October the sum of $15,731.82. Coal to the value of $7,902.73 had been shipped during the month of November, but payment was not yet due. On November 22d officials of appellee and bankrupt met at Detroit to negotiate with the Piney Ridge Coal Company with regard to a reduction in price of the coal which was being furnished it. That company owed bankrupt, at the time, approximately $100,000, of which it paid $40,000 in the course of the negotiations. The remaining $60,000 was attached in a suit against bankrupt instituted by another company. Of the $40,000 paid to bankrupt, $25,000 was in the form of a check, and this the bankrupt indorsed to appellee. The indebtedness of bankrupt for October coal being estimated at $20,000, appellee gave bankrupt its check for the $5,000 difference. Upon returning from Detroit, the official of appellee to whom payment had been made discovered that the indebtedness for October coal had been overestimated by about $4,000, and check for that amount was sent to bankrupt. It is contended by the trustee that the indorsement of the $25,000 check to appellee was to protect the funds covered thereby from being tied up by the attachment; but, while this may be true, it is entirely immaterial in the view which we take of the case. The questions here involved are, not whether the parties were seeking to evade an attachment, but whether the bankrupt was insolvent at the time of payment, and, if so, whether appellee had reasonable cause to believe that the payment would effect a preference.

On the first of these questions, we do not think that it has been sufficiently shown that bankrupt was insolvent at the time of the payment. There is no direct evidence of insolvency at that time, and the contention to that effect is based upon the fact that certain assets later became or proved to be worthless. Bankrupt had been chartered in 1921. In 1922 it had valuable contracts for the purchase and sale of coal; and, on the strength thereof, had set up on its books an item of $10,000 as good will. Counting this as an asset, an audit of its books on September 30, 1922, showed assets of $208,415.33, which amount was approximately $45,000 in excess of liabilities. It is not shown that any losses were sustained between the date of this audit and the payment in question; but insolvency is arrived at by charging off this $10,000 item of good will and accounts alleged to be worthless, amounting to $57,000. Of this $57,000, however, $30,000 was owing by the Southern Elkhorn Company, which at the time of the payment was a going concern, making regular deliveries of coal under its contract with bankrupt. It became bankrupt some time later; but at the time in question there was nothing which would have justified treating the amount which it owed as a worthless debt. The remaining $27,000 of bad accounts were not found to be worthless until some time after the bankruptcy. It is clear that the solvency or insolvency of the bankrupt, for the purposes of this case, must be determined as of the time when the alleged preferential payment was made; and, in determining this, we must value the assets at what they were reasonably worth at that time, not upon the basis of what they turned out to be worth some time later, after bankruptcy had supervened. Rutland County Bank v. Graves (D. C.) 156 F. 168.

But, even if it be conceded that bankrupt was insolvent at the time of the payment, we agree with the learned judge below that there is nothing to show that appellee or its officers had reasonable cause to believe then that it was insolvent, or that the payment would effect a preference. They testify positively that they had no reason to believe that bankrupt was insolvent at that time; and there is nothing in the record to contradict their testimony or impeach their good faith. On the contrary, the testimony tends to corroborate their statement. They knew that the audit, taken less than two months before, showed an excess of assets over liabilities of $45,000. They knew that bankrupt had contracts for the sale of coal under which it was entitled to earn large profits. And they were at the time shipping large quantities of coal to bankrupt on open account. While $60,000 of the assets of bankrupt had just been tied up by an attachment, they were advised of the nature of the claim upon which the attachment was issued, and upon which only $1,600 was eventually recovered. It is true that inability to get rid of the attach-

330

ment destroyed the business of the company, and eventually forced it into bankruptcy; but at the time the payment was made there was no reason to anticipate this result. They may well have thought that the attachment would be released by compromise or the giving of bond, and that the embarrassment arising therefrom would be merely temporary. The fact that they returned the $4,000 overpayment on the October coal, although there was owing at the time more than $7,000 for coal shipped in November, goes far to negative any suspicion that they were trying to obtain a preference.

It is probably true that, because of the attachment of so much of bankrupt's funds, appellee apprehended that bankrupt would be embarrassed and delayed in meeting its obligations, and that appellee was anxious to get the $16,000 payment for this reason; but this falls far short of having reasonable cause to believe that bankrupt was insolvent and that the payment would effect a preference. A creditor may feel anxious about his claim and have a strong desire to secure it or have it paid, and yet not have such belief as the act requires. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by the law. Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 S. Ct. 219, 27 L. Ed. 640; Grant v. First Nat. Bank, 97 U. S. 80, 24 L. Ed. 971; Collier on Bankruptcy (13th Ed.) vol. 2, p. 1307. As said by Judge Learned Hand in Kennard v. Behrer (D. C.) 270 F. 661, 664, "that creditor only the statute proscribes who dips his hand in a pot which he knows will not go round." See, also, Manly v. Southern Supply Co. (C. C. A. 4th) 14 F.(2d) 273.

We agree with the conclusion of the court below that the payment in question was not shown to be a preference within the meaning of the statute; and the decree is accordingly affirmed.

Affirmed.