## CUSICK v. SECOND NAT. BANK.
### No. 7501.

United States Court of Appeals for the
District of Columbia.

Decided Sept. 23, 1940.

Edward Gallagher, of Washington, D.
C., for appellant.

E. F. Colladay and Joseph C. McGarraghy, both of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and VINSON, Associate Justices.

VINSON, Associate Justice.

The J. A. LaPorte Construction Company (referred to herein as the Company)

was a corporation engaged in contracting for and constructing substantial engineering projects. Although it apparently possessed adequate physical equipment for the type of work done, and was successful in securing contracts, the Company was a bit shy on working capital. It is usual in this type of work for the contracting party to make payments as the work progresses, withholding a percentage pending successful completion of the job. These periodic payments will defray a substantial portion of current operating expenses, but they are not always available as soon as needed. Thus in the case of the Company a certain amount of outside credit was necessary.

In the late Spring of 1936 the Company was occupied with one large construction project, a P. W. A. financed sewage disposal plant for Arlington, Virginia. Further credit than that extended by a Virginia Bank was needed and the Company secured an introduction to the Second National Bank of Washington, D. C. (the Bank), through a substantial customer of the latter. On its request for a line of credit, the Bank required production of certain financial information, report as to the progress on the Arlington job and the general outlook. After this information had been checked, a loan of $15,000 was made to the Company on June 3, 1936. June 4th an additional loan of $5,000 was made. Thereafter, the Company regularly reported its financial condition and progress on its work to the Bank (two additional contracts were secured by it after the start of its relationship with the Bank, a sewer job for the City of Frederick, Maryland, and a federal project in Rock Creek Park, Washington, D. C.), received credit extensions, and made payments on its indebtedness thereto. Concurrently, it maintained a checking account in the Bank. Into this account it deposited the periodic payments received on its work and the proceeds of loans made by the Bank. From it the Company withdrew funds to meet its payroll and other operating expenses, and such repayments as it made to the Bank.

Thus between the Company and the Bank a dual debtor-creditor relationship existed.

In the course of the transactions between the parties, the Company on November 9, 1936 reduced its indebtedness to the Bank from $23,677 to $17,500, and a note was given for that amount to mature January 8, 1937. Later, December 23, 1936, an additional loan in the sum of $5,000 was made, to mature January 11, 1937.

On January 8, 1937, the Company deposited in its account the sum of $15,806.12, a payment on the Rock Creek Park job. Some time that day the Company's Treasurer informed the Bank's President that certain payments expected in the month of January would not be received until later and requested a renewal of the $17,500 (January 8th) note. The President indicated he would take the matter up with the credit committee.[1] The next day, January 9, 1937, the Company deposited an additional $16,229.63, a payment on the Frederick, Maryland job. Later that same day, a Saturday, the Bank applied the Company's deposits (consisting almost entirely of the two payments hereinbefore mentioned) to the $17,500 note due on the 8th of January, and on Monday, January 11th, did likewise in respect to the note for $5,000 due that day; the President of the Bank having concluded from the information received on the 8th that it was desirable to take this action.

On May 6, 1937, almost four months later, creditors filed a petition to have the Company's assets distributed in accordance with the Bankruptcy Act. Thereafter, the Company was adjudicated bankrupt and a Trustee appointed.

In this action the Trustee sought to recover from the Bank $21,693.75, that portion of the Company's deposits which the Bank applied to retire the two notes referred to. The theory of the Trustee's action is that the payment thereby realized by the Bank constitutes a voidable preference under § 60, sub. b of the Bankruptcy Act,[2] not a permitted set off transac-

---

[1] The Bank President so testified. The Company's Treasurer gave somewhat confused testimony on this point. One version of the transaction given by him was that the President, at the time of the request, stated the notes would not be renewed. While this, if true, would be material to the question whether the Bank accepted the deposit of the next day in good faith, it is of little significance in

respect to the point on which our disposition of the case turns.

[2] "Sec. 60, sub. b. If a bankrupt shall have procured or suffered a judgment to be entered against him in favor of any person or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the recording or registering of the transfer if by law recording or register-

tion.[3] Under the Act and the decisions construing it, the Trustee's action could succeed only if (1) either the Company or the Bank, at the time of the deposits, intended them to operate as a payment of the notes, not as an ordinary deposit subject to withdrawal;[4] and (2) the Company was at that time insolvent in fact;[5] and (3) the Bank had reasonable cause to believe, at the time of the deposits, that payment of the notes would effect a preference, i. e., reasonable cause to believe the Company was then insolvent in the bankruptcy sense.[6] On trial of the action and after all evidence was in, a motion by the defendant Bank for a directed verdict presented the question whether an issue had been made for the jury in respect to each of these three factors. The District Court indicated an opinion that a jury question had been made out on the issue of the Company's insolvency in fact at the time of the deposits, but held otherwise in respect to issues (1) and (3) and directed a verdict for the Bank. From that judgment the Trustee (appellant herein) appeals.

Although on this appeal the controversy between the parties ranges over the entire front, we find it necessary to consider only the question whether a jury issue had been made out in respect to the third factor. The appellant concedes that, if the record will not support a finding that, at the time of the deposits in question, the Bank had

---

ing thereof is required, and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person. And for the purpose of such recovery any court of bankruptcy, as hereinbefore defined, and any State court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction." 30 Stat. 562, as amended, June 25, 1910, 36 Stat. 842. 11 U.S.C.A. § 96, sub. b.

[3] "Sec. 68, sub. a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." 30 Stat. 565, 11 U.S.C.A. § 108, sub. a. See New York County Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380; Studley v. Boylston National Bank, 229 U.S. 523, 33 S.Ct. 806, 57 L. Ed. 1313.

[4] If both depositor and the bank intend, at the time the deposit is made, that it be subject to withdrawal and not applied to payment of the depositor's debt to the bank, the transaction does not constitute a transfer under § 60, sub. a of the Bankruptcy Act. Hence, such a deposit could not be a preference, much less a voidable one, and the bank may subsequently, under § 68, sub. a set it off against the depositor's debt. New York County Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199,

48 L.Ed. 380; Studley v. Boylston National Bank, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313. If, however, the deposit is given by the depositor or received by the bank as a payment on the depositor's note, a transfer occurs which may constitute a voidable preference. Mechanics & Metals National Bank of New York v. Ernst, 231 U.S. 60, 34 S.Ct. 22, 58 L. Ed. 121. See cases discussed and cited in note 85 A.L.R. 369.

[5] In order that a transfer be either a preference under § 60, sub. a or a voidable preference under § 60, sub. b it is essential that at the time the debtor be insolvent. See note 2 supra.

[6] Under § 60, sub. b of the Bankruptcy Act, as amended June 25, 1910, 36 Stat. 842, the distinguishing characteristic between a voidable preference and one that cannot be disturbed, is that in the former case the creditor must at the time . of the transfer "have reasonable cause to believe that the * * * transfer would effect a preference". See Pirie v. Chicago Title & Trust Company, 182 U.S. 438, 446, 447, 21 S.Ct. 906, 45 L. Ed. 1171. By § 60, sub. a, 30 Stat. 562, 11 U.S.C.A. § 96, sub. a, a preference is defined as a transfer the effect of which enables any one creditor to obtain a greater percentage of his debts than any other creditor of the same class. This presupposes insolvency in the bankruptcy sense, i. e., liabilities in excess of 'assets. See 30 Stat. 544, 11 U.S.C.A. § 1(19), and Pirie v. Chicago Title & Trust Co., supra, 182 U.S. at page 450, 451, 21 S. Ct. 906, 45 L.Ed. 1171; In re Eggert, 7 Cir., 102 F. 735, 736, 738. Where, as here, a general unsecured creditor receives payment in full, the test can be rephrased to query simply whether at the time of payment he had reasonable cause to believe the debtor insolvent.

reasonable cause to believe the Company insolvent, then the District Court's judgment directing a verdict against him, must be affirmed.

The nature of reasonable cause to believe a debtor insolvent was authoritatively defined by the Supreme Court in Grant v. First National Bank [7] as follows:

"Some confusion exists in the cases as to the meaning of the phrase, 'having reasonable cause to believe such a person is insolvent.' *Dicta* are not wanting which assume that it has the same meaning as if it had read, 'having reasonable cause to suspect such a person is insolvent.' But the two phrases are distinct in meaning and effect. It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. *A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it,—and yet such belief as the act requires may be wanting.* Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose.

"The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided.

"Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man." (Italics supplied) [8].

Since the date of its decision the rule laid down in the Grant case has been followed consistently [9] and there is no doubt but that it represents the law on this point.

We come then to the question whether the record would support a finding that the Bank had knowledge of some fact or facts which in the mind of a reasonably intelli-

---

[7] 97 U.S. 80, 24 L.Ed. 971.

[8] Ib., 97 U.S. at pages 81, 82, 24 L.Ed. 971. Although the language of § 60, sub. b under consideration in the Grant v. First National Bank case was amended by the Act of June 25, 1910, 36 Stat. 842, so that the criterion was phrased "reasonable cause to believe that the * * * transfer would effect a preference", as applied to this case, both parties concede that means reasonable cause to believe the Company insolvent.

It is of interest to note, though not material to the instant case, that under the new Bankruptcy Act of 1938, this criterion has been changed to read "rea-sonable cause to believe that the debtor is insolvent". 11 U.S.C.A. § 96, sub. b.

[9] Stucky v. Masonic Savings Bank, 108 U.S. 74, 75, 2 S.Ct. 219, 27 L.Ed. 640; Sharpe v. Allender, 3 Cir., 170 F. 589; Bassett v. Evans, 8 Cir., 253 F. 532, 535; Essex National Bank v. Hurley, 1 Cir., 16 F.2d 427; Everett v. Warfield Mining Co., 4 Cir., 37 F.2d 328, 330; Brown Shoe Co. v. Carns, 8 Cir., 65 F.2d 294; Brookheim v. Greenbaum, D.C., S.D.N.Y., 225 F. 635, 637; Beall v. Bank of Bowden, D.C., N.D.Ga., 219 F. 316. The foregoing are merely representative cases and by no means represent an exhaustive citation of all decisions applying the principle laid down in the Grant case.

gent man would produce, not a mere suspicion, but a well founded belief that the Company was insolvent at the time of the deposits. In this inquiry decisions in other cases on different facts are of no assistance [10] and the authorities relied on by the appellant [11] are all distinguishable on that ground. Determination of the issue simply requires an analysis of evidence in the record on this point.

As stated previously, when the Company secured its first loan, the Bank required it to give certain information respecting its financial condition. This information, checked by the Bank in an independent investigation, revealed that the Company's assets far exceeded its liabilities. Subsequent periodic reports reaffirmed this condition. The latter part of August or the early part of September, 1936, the Bank received a complete financial statement, prepared by a certified public accountant, which again showed a very strong financial condition for the Company. As of July 31, 1936, total assets were given as $230,722.70 with liabilities of $65,144.40. Reports by the Company to the Bank, after receipt of this statement, continued to show the Company with a strong asset position, assets in large part representing work actually done but for which payment had not yet been received. The appellant argues these reports should have indicated to the Bank that the Company was in unsound condition. Testimony in the record concerning them requires the opposite conclusion. In fact, moreover, the Bank continued to extend credit on their strength.

In December 1936, the Company sought an additional loan of $5,000 to meet a payroll. The contention of the appellant, that circumstances surrounding this loan should have reasonably caused a belief on the part of the Bank that the Company was then insolvent, is likewise without support in the record. Under date of December 13, 1936, the Company's Treasurer wrote the Bank requesting this loan, together with a statement of the Company's current financial condition. This letter read as follows:

"This month our estimated income is $45,000 net. From the Frederick job we expect $29,000, and from the Rock Creek Park job, $16,000.

"At the present time the sewage treatment plant at Arlington has been accepted by the consulting engineers and the P. W. A. We are awaiting the action of the Board of the County. On this job the retained percentage is $21,500. Last month's estimate, which will be paid with the final is $2,300. The approved extras to date are $3,500 with more to come. This totals $27,300 on this job.

"On the sewer job in Frederick the retained percentage is $26,900. For Rock Creek Park the percentage is $4,100. This means a total of retained percentages and approved work of $58,300. In addition to those there will be current earnings of $50,100, gross, or $45,000 net.

"Inasmuch as the last month's estimate on the sewage treatment plant will be paid with the retained percentage, it becomes necessary for us to request a loan to take care of payrolls from December 24 to January 6 of $5,000.

"Christmas falls on Friday, the 25th, and we have been requested to make our payroll on the day before Christmas instead of the due date, which is the 26th.

"I feel that the final estimates and retained percentages will be paid by the Arlington County on January 18.

"By the end of next week all of our main trench will be finished in Frederick which leaves us with only the housing connections to do. This cuts our pay roll 75 per cent.

"Our estimated date of completion for the Frederick sewer is February 15, and Rock Creek Park will be finished on February 20.

"Any other information you desire, don't hesitate to call on us for it."

On the basis of this information the Bank granted the loan December 23, 1936. Previously it had extended similar payroll loans under like circumstances. That it was willing to again do so just two weeks before the deposits in question is evidence of continued, and, in the light of the previous experience, not unreasonable confidence.

■ It appears from the record that the Bank's next information respecting the Company's financial condition was the

[10] Bassett v. Evans, 8 Cir., 253 F. 532, 535.

[11] Mechanics & Metals National Bank of New York v. Ernst, 231 U.S. 60, 34 S. Ct. 22, 58 L.Ed. 121; Essex National Bank v. Hurley, 1 Cir., 16 F.2d 427; In re McDonald & Sons, D.C., 178 F. 487.

statement by its Treasurer to the Bank's President January 8, 1937, that the receipts expected for that month would be in part delayed,[12] and a request that the notes be renewed. There was no indication that the assets of the Company had been in·any way diminished, rather a statement that their conversion into cash would take somewhat longer than expected. With a caution not uncommon in bankers, the President determined on the basis of this information that it would be desirable from the Bank's viewpoint to realize on the Company's matured notes by a set off against its deposits, rather than extend further credit. On this determination he acted. It might be said that the information received by the Bank just prior to the off set would constitute reasonable cause to *suspect* that the Company might experience difficulty in meeting current obligations, and in the mind of the Bank's President it apparently did produce that suspicion. Under the Bankruptcy Act inability to meet current obligations is not insolvency, however. The test, rather, is the relation of the debtor's total assets to its liabilities. Since the Treasurer's statement indicated only a postponement in the realization by the Company on its assets,

the Bank was in possession of no fact or facts, by reason of his report, that would *reasonably cause it to believe* the Company's preponderance of assets over liabilities had been altered.

■ The above constitutes a summary of all direct testimony concerning facts known to the Bank respecting the Company's financial condition at the time of the deposits,[13] and there is nothing in the record from which it could be found that the Bank was not justified in relying on this information secured by it.[14] Thus, from the direct testimony on the point in the record, the conclusion is irresistible that, at the time of the deposits, the Bank had no reasonable cause to believe the Company insolvent, but quite the contrary.

In searching the record for indirect circumstantial evidence that might be sufficient to create a jury question on this issue, the appellant points to testimony concerning certain precautionary action taken by the Bank respecting the Company's account.[15] From this he would infer that the Bank must have had other knowledge respecting the Company's financial condition than that contended in the above reviewed

---

[12] The treasurer informed the Bank's President that the payment expected from the Frederick, Md., job would be cut from $30,000 to $20,000. This was merely a periodic estimate payment and the reduction did not indicate the Company's final receipts would be diminished. The treasurer also indicated the Arlington, Va., final payment was being held up by a controversy over extras, which constituted but a fraction of the payment due.

[13] The appellant contends significance must be attached to certain testimony that the Company abandoned its projects at about the time the deposits were made. The testimony on this point is conflicting. There is no evidence in the record, however, to support a finding that the Bank knew of this alleged abandonment, if it had then occurred.

[14] An accountant witness testified in the District Court that an independent audit made at the behest of one of the company's sureties in the latter part of January indicated the Company's assets as of January 15, 1937, exceeded its liabilities by some $31,000. Had the Bank checked the Company's books at the time of the deposits in question, therefore, a solvent condition would have appeared.

[15] There is testimony in the record concerning two precautionary measures.

The first was a rule allegedly promulgated by a Vice President to the effect that checks on the Company's account should not be cashed without the approval of an officer of the Bank. In fact checks were cashed on the account with such approval prior to and after the set off. There is in the record no testimony which would support a finding that such rule, if adopted, had any connection with the subsequent set off. Rather, the record would indicate the rule was merely a precaution against withdrawal by check when there were no funds in the account or when it contained only questionable uncollected checks on other banks. The Vice President who allegedly promulgated the rule testified that it was general and applied to all accounts when the balance therein was represented by uncollected checks.

The second precaution testified to was the act of the Bank in sending the check deposited January 9th to the bank on which it was drawn for certification the same day. The Bank President testified that a desire for cash before cancelling the Company's notes and the protection speed gave against the writing of checks against its account by the Company prompted this certification. There is in the record no testimony contradicting this explanation.

statements and reports. The more reasonable explanation, we think, and that supported by the record,[16] is that these measures were nothing more than cautious banking practice, and not evidence of an omniscient power. It may be that they indicate doubt or suspicion on the part of the Bank concerning the Company's ability to meet its current obligations. We are clear, however, that in light of the whole record they would not support a finding that it had or should have had knowledge of facts that would reasonably produce, not a mere suspicion, but a well-founded belief that the Company was insolvent at the time of the deposits of January 8th and 9th. Cf. Grant v. First National Bank, 97 U.S. 80, 24 L. Ed. 971; Valley Nat. Bank v. Westover, 9 Cir., 112 F.2d 61; Brookheim v. Greenbaum, D.C., S.D.N.Y., 225 F. 635.

From the foregoing it follows that the judgment of the District Court directing a verdict for the defendant Bank must be affirmed.

Affirmed.

---

[16] See note 15 supra.