**CANRIGHT v. GENERAL FINANCE
CORPORATION.**

Civil No. 69–D.

District Court, E. D. Illinois.

Dec. 11, 1940.

H. H. Whittemore, of Kankakee, Ill., for plaintiff.

Green & Palmer, of Urbana, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff brought this suit as trustee of the Estate of Edward Wennerholm, Bankrupt, against the General Finance Corporation, alleging that on or about March 25, 1939, Wennerholm was indebted to defendant in the sum of $5,177.64, unsecured; that on various days between March 25, 1939, and April 21, 1939, Wennerholm paid all of said indebtedness to defendant; that on each of said dates Wennerholm was insolvent and defendant knew or had reasonable cause to believe that the payments effectuated preferences voidable and recoverable under the Bankruptcy Act.

Defendant answering admitted the payments, denied that it lacked security, averred that the moneys paid it were in fact those of defendant, denied that Wennerholm was insolvent at any of the times mentioned; or that defendant knew or had reasonable cause to believe that he was insolvent or that any of the payments were preferences.

Upon trial it appeared that Wennerholm had been a retail automobile dealer at Momence from March 1, 1938, to May 2, 1939, on which latter date he was adjudicated bankrupt upon his voluntary petition. His assets from March until late April consisted of from six to eight new cars, on the floor, incumbered for their full cost value, some twenty-five to thirty used cars, likewise incumbered, livestock taken in trade, mortgaged for its full value, automobile parts, tools and equipment, likewise mortgaged, and accounts receivable amounting to some $6,000 in face value. He owed, besides his secured indebtedness, to his bank, some $4,000; unpaid taxes, $1,500; and, to other creditors, some $11,000 besides $10,000 on fictitious contracts sold to finance companies and $5,000 to an uncle for wrongfully hypothecated securities. The unsecured claims filed and allowed against his estate aggregated $19,341.50. He owned during this period, as unincumbered assets, accounts receivable of doubtful value and some few items of personal property, all of which was of a fair value of far less than $5,000. He had financed all of his purchases through finance companies by socalled "Floor Plan" and sold his cars upon conditional contracts of sale, financing them likewise through different companies of which defendant was one.

He first began to sell contracts to defendant late in 1938, and, beginning with January, 1939, he prepared and sold to defendant fictitious contracts of sale which defendant purchased without knowledge of their invalid character. In March, 1939, defendant, in checking up the contracts it had purchased from Wennerholm, learned that one of such contracts purported to be made with one P. H. Evans. An agent of defendant went to Evans' house and talked to Mrs. Evans about nine o'clock in the evening of March 23, 1939. She told him that she knew nothing of any car belonging to her husband. He then talked to Evans at a garage and learned that he did not have the car. The same night the agent questioned Wennerholm, who told him that the car had been resold, that the money collected was due defendant and that he would pay the amount due. On March 25, he gave a check to defendant in the sum of $579.42.

Early in April, the same agent checked another contract, that of Reynolds, talking to a relative of the latter. He found no car in Reynolds' possession and so advised Wennerholm, who again said that he owed the money and would pay. Subsequently, on April 14, 1939, he gave defendant a check for the amount of this contract, $589.16. On the same day the agent checked another contract, that of R. E. Murphy, and was unable to locate the automobile.

Directly following this series of events, on April 17 Wonderlin, the manager of the Champaign District Office, together with Evans, the agent who had investigated the three contracts, in possession of records of all deals which defendant had had with Wennerholm, went to Momence, accompanied by another representative of defendant, McCormick, from Kankakee. These three men met the bankrupt at his garage at Momence. They advised him that there was doubt in their minds as to the possession of the automobiles covered by the respective conditional contracts of sale as represented therein. Each deal was covered by an account card and all these were discussed and finally divided into two groups. In one pile were placed, according to Wennerholm, those contracts which were bonafide. The other pile contained eight contracts, three of which were

the Evans, Reynolds and Murphy deals above mentioned. The total of these contracts was $5,177.64. Wennerholm testified that the three men said to him that a check of the contracts had convinced them that some of them were fictitious; that he then said "yes, how much do I owe you,—I will pay it"; that they answered "around $6000." According to his testimony, he advised them that none of the eight contracts was bona fide and that the customers did not have and had not had the cars covered thereby. All the parties agree that Wennerholm said that he did not have the money but that he would try to pay in full.

The next day the manager of defendant's Chicago Office, Mr. Oldberg, together with Le Gof, its auditor and financial adviser, came to Momence. Later Mr. Jamieson, general counsel for defendant also arrived. The six representatives of defendant were in the city over the three days, some of them leaving for a portion of the time, some of them coming and going but one or more of them being present at all time. During this period, Wennerholm paid, on April 18, 1939, $588.16 and $746.30. On April 20, $2,404; on April 21, $1,184.76. He had previously paid on March 25, 1939, on the Evans contract $579.42. The total payments were $5,502.64. Of this amount the payment made on one contract, that of J. W. Kalka, $325 represented a legitimate transaction. The difference $5,177.64 is the sum paid to defendant upon contracts which were fictitious and represented in fact no sale.

During the three days the representatives of defendant were frequently in Wennerholm's garage. They could see how many cars, new and used, were on the floor. They knew that Wennerholm "floor planned" his automobiles. They were frequently in the bank and had opportunity to make inquiry of merchants and others concerning the financial responsibility of Wennerholm. Each of them asserts that on no occasion was any question put to Wennerholm by any of them as to how much money he owed and what property he had. But Wennerholm testified that they asked him and were fully advised by him as to his financial condition, disclosing that he was badly insolvent and that he had no free assets of substantial value.

Defendant knew at that time that Wennerholm had prior thereto issued checks which had been dishonored. It knew that in October, 1938, Wennerholm had financed one car with defendant in Chicago and also with its Champaign Office. As soon as defendant learned of this double financing it demanded payment of one of the accounts. Defendant, after its investigation, knew that the Evans, Reynolds and Murphy accounts were fictitious. The circumstances surrounding each investigation and the conversations had were of such character that defendant, through its agents, must have known or if it did not know, was bound to know as a reasonably prudent creditor that each of these contracts was fictitious. Defendant, according to its own testimony knew also that Wennerholm had collected various contracts and withheld the money. It knew on the evening of April 17, under its own testimony, that Wennerholm then said that the eight contracts represented false transactions, i.e., the cars were not in the hands of the purchasers and he owed the contract sums to defendant. If Wennerholm is to be believed, defendant's agents knew at that time from his own statements that these contracts were wholly fictitious. During the three days spent in Momence they were constantly demanding payment of defendant. If Wennerholm is to be believed, they knew that much of the money they received was collected by him upon fictitious contracts which he sold during this period of time to other finance companies.

In this situation it seems apparent that on April 17 and at all times thereafter, defendant knew or had reasonable cause to believe that Wennerholm was insolvent, that a large number of contracts they had purchased from him were fictitious; that it had no security; that he had no free assets out of which the debt could be satisfied and that the payments made effectuated preferences to it over unsecured creditors' claims amounting to many thousands of dollars. It is not to be believed that the representatives of defendant during their three days in Momence never inquired of Wennerholm as to his assets and liabilities or that they never inquired of other parties as to his financial responsibilities. I find as a fact that they did inquire of Wennerholm and were advised by him of his insolvency.

A voidable preference under the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., does not involve any fraudulent intent. Indeed, in the absence of the bankruptcy

law, a diligent creditor may lawfully retain a preference irrespective of his knowledge of his debtor's insolvency. But the purpose of the Bankruptcy Act is to bring about equality of division of assets amongst creditors. For the rule that to the diligent creditor belongs the reward, the act substitutes the rule that equality is equity. Congress has seen fit to provide that if a creditor has reasonable cause to believe that his debtor is insolvent and, consequently, that property received from him in payment will effectuate a preference he may not withhold the same as against other creditors. A preference is not an act evil in itself but one prohibited by the Bankruptcy Act in the interest of equality of division. In determining whether a prohibited preference has been received, the question in fact involved is as to whether defendant had reasonable cause to believe that the debtor was insolvent. Bearing upon this, the knowledge of dishonored checks was pertinent; Brown Shoe Co. v. Carns, 8 Cir., 65 F.2d 294, at page 297; In re Campion, D.C., 256 F. 902, at page 903; likewise knowledge of double financing; Prudential Insurance Co. v. Nelson, 6 Cir., 96 F.2d 487. Investigation and consequent ascertainment of the dubious character of the Evans, Reynolds and Murphy contracts likewise were strong circumstances: Irving Trust Co. v. Commercial Factors Corp., 2 Cir., 68 F.2d 864, at page 867; so too as to Wennerholm's failure to remit money collected on legitimate paper.

Defendant was charged with what it learned or should have learned as a reasonably prudent business man, through its representatives in their three days' visit in Momence. Failure to investigate will afford no excuse when the creditors' knowledge and information are sufficient to have put an ordinary business man on inquiry. Schoenbrod v. Central Trust Co., 7 Cir., 238 F. 775; Reed v. Federal Finance Corp., D.C., 291 F. 679, at page 680; In re Campion, D.C., 256 F. 902, at page 907. It is not a question of actual belief. Rather, the test is the belief that ought reasonably to be entertained under the facts known—the inference which an ordinarily intelligent business man would draw from the facts which he would discover if he made inquiry. Defendant could not close its eyes to known or obvious facts, or to facts which it could have ascertained, by making the inquiry of a reasonably prudent business man. In re Clark, D.C., 11 F.2d 540, at page 541; McGee v. Branan & Carson Co., D.C., 2 F.2d 758, at page 759; Watchmaker v. Barnes, 1 Cir., 259 F. 783, at page 786. It was bound to make real inquiry, that is, such an investigation as a reasonably prudent and honest business man would have made under the circumstances known. Burk v. Musk, D.C., 51 F.2d 581.

Defendant asserts that inasmuch as the contracts upon which the payment was received were fictitious, the moneys Wennerholm paid over were trust funds. But the proof shows that the moneys delivered by Wennerholm to defendant were not funds received from it but were collected by him from other sources. There is no identification of trust funds. Indeed, defendant knew that various of the payments received came from the sale of other fictitious contracts to other companies. The contracts having been fictitious, defendant held no security and cannot assert any secret equity against other creditors represented by the trustee in bankruptcy.

Defendant insists also that in determining the bankrupt's solvency or insolvency, it had a right to include the assets of the bankrupt's father, on the theory that the latter was a partner. The record is silent as to such relationship. If there were silent parties, opportunity was afforded by the act to any creditor to bring in as a party to the bankruptcy proceeding any such partner. Defendant's assertion of a right to rely upon the existence of such copartnership can not be taken seriously in view of Wennerholm's testimony that he had given defendant, at its request, his individual financial statement and its failure to produce the same when requested to do so. Inferences to be drawn from these circumstances are to be resolved against defendant.

I conclude that defendant on April 14, 1939, after the settlement of the Evans contract, knew that Wennerholm was insolvent, or, at least, had reasonable cause to believe that he was insolvent. I conclude further that during the time defendant was making its investigation of the Evans contract, it was making a reasonable investigation and that at the time payment of this debt was made, defendant had not yet acquired such knowledge as would impose upon it reasonable cause to believe

that defendant was insolvent. That payment did not constitute a voidable preference. All other payments, however, were made after April 14 and defendant had become charged with notice. I find, therefore, that defendant should be charged with the following sums:

| | |
|---|---|
| Amount paid on so-called Alfred Hemm contract | $ 708.22 |
| Amount paid on so-called Reynolds paper.. | 588.16 |
| Amount paid on so-called Murphy paper.... | 761.98 |
| Amount paid on so-called E. C. Kessner contract | 797.98 |
| Amount paid on so-called Bert Fowler contract | 818.62 |
| Amount paid on so-called Chas. Sharkey contract | 312.61 |
| Amount paid on so-called Wm. Pearson contract | 610.65 |
| Or a total of | $4,598.22 |

Judgment will enter in favor of plaintiff and against defendant for this amount. Execution will be awarded.