**INTERNATIONAL MINERALS & CHEMICAL CORPORATION, Appellant,**

v.

**Harry MOORE, Jr., as Trustee for and on behalf of the Estate of Billie Sol Estes, Appellee.**

No. 22181.

United States Court of Appeals
Fifth Circuit.

May 27, 1966.

Rehearing Denied July 15, 1966.

Marvin Jones, Senior Judge, dissented.

Sloan B. Blair, Fort Worth, Tex., for appellant.

William J. Rochelle, Jr., John L. King, Dallas, Tex., Harry Moore, Jr., Trustee, Allan Poage, El Paso, Tex., for appellee.

Before JONES, Senior Judge,* and GEWIN and BELL, Circuit Judges.

GEWIN, Circuit Judge:

This is an appeal from the judgment of the United States District Court for the Northern District of Texas in a bankruptcy case. Appellee, the Trustee in Bankruptcy of the estate of Billie Sol Estes, recovered judgment against International Minerals & Chemical Corporation (International) in the court below for the sum of $8,518.55, representing the proceeds of two checks issued to International by one of the Estes' proprietorships, and paid within four months of bankruptcy. Appellee successfully contended in the trial court that such payments constituted voidable preferences under Sections 60(a) and (b) of the Bankruptcy Act, 11 U.S.C.A. § 96.

The singular issue presented both to the trial court and on this appeal is whether International, or its agents acting with reference thereto, had reasonable cause to believe that Billie Sol Estes was insolvent at the time the payments in question were made. The District Court sitting without a jury ruled that International had knowledge of facts sufficient to put it on inquiry with reference to the financial stability of Estes' commercial activities, and consequently had reasonable cause to believe, under Section 60(b) of the Bankruptcy Act, that the debtor was insolvent at the time the questioned payments were made. No authority is cited in support of the District Court's holding. The District Court entered one conclusion of law which reads:

> "Under and by virtue of the provisions of Section 60 a and b of the Bankruptcy Act (11 U.S.C., Sections 96 a and b) the transfers made on or about December 15 and December 16, 1961, in the total amount of $8,518.55, constitute preferences which are voidable and recoverable by the Plaintiff for the benefit of the bankrupt estate."

International contends that the above ruling is infected with error because there was insufficient evidence to support such a conclusion.

* Of the Court of Claims, sitting by designation.

■ The basic facts involved are essentially undisputed. Aside from documentary evidence which is before us for examination, there was only one witness. The decision of the District Court is not based on credibility determinations. In the circumstances here present our scope of review is not as restricted as it would be where the facts are disputed and credibility findings are involved. Rule 52(a), F.R.Civ.P.; Galena Oaks Corp. v. Scofield (5 Cir. 1954) 218 F.2d 217; Mitchell v. Raines (5 Cir. 1956) 238 F.2d 186; Mayo v. Pioneer Bank & Trust Co. (5 Cir. 1961) 297 F.2d 392.[1]

The Petition in Bankruptcy was filed on April 7, 1962. International had previously engaged in substantial business transactions with Estes on an open account basis since the year 1956. In June of 1958, its records reflected that credit sales to Estes totalled approximately $146,631.00. This figure was rapidly approaching the total credit limit of $150,000.00 allowed Estes by International. On or about June 1, 1958, International took three $50,000 notes from Estes due and payable December 31, 1958, to evidence the indebtedness on the open account balance. These notes were not paid at maturity. Consequently, International ceased doing business with Estes except on a strictly cash basis during early 1959, and in June of 1959 terminated its business relationship with Estes entirely because of its prior difficulty in note collections, the debtor's unorthodox sales practices, and because, as its area sales manager testified, " * * * we were not in the loan business but in the fertilizer manufacturing and selling business." Thereafter, International continued to press Estes for payment as any prudent business man would do, and, finally, in late 1959 or early 1960, it entered into a financing arrangement with Estes for the repayment of a part of the indebtedness. Under the terms of this arrangement, Estes delivered to International a series of twelve post-dated checks for $5,000 each, dated consecutively on the 15th of each month beginning January, 1960, and running through December, 1960. This post-dated check arrangement was preferred because it alleviated the necessity of re-contacting Estes each month for a payment. International's area sales manager, the sole witness in the case, testified that such a financing arrangement was not unusual in their type of business and that " * * * we frequently get postdated checks from customers." Each of these checks was paid when presented. In the latter part of 1960 or early 1961, Estes delivered to appellant another series of twelve post-dated checks, each in the amount of $6,550.40, dated consecutively for the months of calendar year 1961, plus a check for interest on the unpaid balance in the amount of $1,963.45, which was also dated in December, 1961. This series of checks liquidated the entire indebtedness and each check was paid when presented. Both the December 1961 check for $6,550.40, plus the interest check, were paid on presentment, such presentment date being within four months of bankruptcy.[2] The present litigation concerns only these latter two payments.

---

1. In the *Mayo* case the rule is stated as follows:

"Under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. the trial judge's findings of fact are conclusive unless clearly erroneous, but when the factual determination is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, appellate review is far broader than where disputed evidence and questions of credibility are involved. Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186; Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217. Our scope of review in this case is broad, since the decision turns not on what the officers of the bank in fact believed, but on what they had 'reasonable cause' to believe; and, most of the basic facts are undisputed."

2. It was stipulated that: the checks were paid on December 15 and 16, 1961 and the Bankruptcy petition was filed on April 7, 1961.

During the course of business dealings with Estes, International, through its area sales manager, carried on an extensive correspondence with both Estes and its home office in Illinois. Most, if not all, of this correspondence was introduced in evidence in the lower court, and from the general tenor and content of these writings, the trustee in bankruptcy sought to prove that International did have "reasonable cause" to believe in the insolvency status of Estes at the time of the last two payments in December, 1961. Many of the letters from the sales manager of International to Estes contained the usual language found in "dun" notices, calling attention to the overdue balance and asking for either a partial or total remittance. Several threatened legal action if a payment on account was not forthcoming. Inter-Office Memoranda were also exchanged between the area sales manager and various corporate officers of International. For example, the Trustee's Exhibit No. 8 was an Inter-Office Memo dated February, 1960, signed by the area sales manager and addressed to the General Credit Manager of International. The following language in this memorandum is heavily relied upon by the Trustee to sustain his argument that International had reasonable cause to believe Estes insolvent:

"I still believe he will work out and that we will get all our money eventually unless someone sues him for a sizeable amount and throws him into bankruptcy. So far he has been able to avoid that. But the fear that that might happen is the reason we have requested the collateral notes so that we would have at least something to fall back on in the event a suit was filed or that he went into bankruptcy for other reasons."

Counsel for the Trustee asked the area sales manager the following questions relative to the above memorandum:

"Q. So, at that time you at least had a fear that he might be thrown into bankruptcy?

"A. Mr. Rochelle, we never had any fear of eventually collecting our money. We had a fear that we weren't going to get it in time and we didn't get it in time, but we kept hammering at it until we did get it.

"Q. What do you mean when you say you didn't get it in time?

"A. Well, it wasn't paid when it was due."

The Trustee's Exhibit No. 9 was a memorandum dated February 24, 1960, addressed to the area sales manager from one A. B. Cunningham, Assistant General Credit Manager of International, in which the following statement appeared:

"I believe, as you do, that we will eventually collect our money provided there is no bankruptcy brought about by a suit for a sizeable amount or other reasons."

Appellee's counsel then inquired of the witness:

"Q. So Mr. Cunningham also, did he not, have the fear that there might be an intervening bankruptcy in the matter?

"A. He's repeating more or less what I told him, which information came only from me, in other words, continuing pressure to collect our money."

Additionally, the Trustee introduced certain Dun and Bradstreet reports concerning Estes in an attempt to bolster his argument that International had knowledge of the bankrupt's insolvency sufficient to place it within the proscription of Section 60(b) of the Bankruptcy Act at the time of the last two payments in question. International's area sales manager testified that these reports were ones normally requested with respect to all of their accounts. It is important to note that the last Dun and Bradstreet reports were rendered in October, and December, 1960, some twelve to fourteen months prior to the date of payment of the checks now in issue. One of the reports contained the following statement concerning Estes' commercial dealings: "Activities continue to be deversified

[sic], however, financed primarily on credit basis with encumbrances moderately heavy." This report stated further that expansion had been very rapid, and "Because certified financial information is lacking, as well as some slowness continuing to be reported with suppliers, it is impossible to evaluate the present status of subject business for credit purposes." At the time this report was received, appellant was receiving $5,000.00 per month from Estes by virtue of the post-dated check agreement. As previously indicated, all of the post-dated checks were promptly paid upon presentment at regular monthly intervals during the years 1960 and 1961.

Viewing the evidence and the supporting exhibits in their entirety under the broad mandate of Rule 52(a), and the cases cited earlier, we are compelled to conclude that the evidence adduced in the court below reveals a hiatus in proof fatal to the appellee's case. Two principal reasons compel a reversal.

*First:* "Reasonable cause" as used in the Bankruptcy Act, providing that a preference may be avoided in a suit by the trustee if the payee had reasonable cause to believe that a preference would be effected, means knowledge of such facts which would induce a reasonable belief as opposed to suspicion. The proof is also sufficient to support a finding of reasonable cause if the person alleged to have received a preference, or his agent, has knowledge of such facts as would induce a person of reasonable prudence to make appropriate inquiry, in circumstances in which such inquiry would have revealed the facts essential to a knowledge of the true situation. Canright v. General Finance Co. (7 Cir. 1941) 123 F.2d 98; Mayo v. Pioneer Bank & Trust Co., supra. The evidence shows that International had done a large volume of business on an open account, unsecured basis with the debtor up to June, 1959. At that time it ceased doing business with the debtor primarily because of his then heavy indebtedness

to it. After a period of approximately one and one-half years from the due date of the original notes evidencing the indebtedness, International persuaded Estes to pay his debt by a series of post-dated checks running over a two year period. This course of business dealings continued for the two years agreed upon unabated by any indication of financial insolvency.

Anxiety on the part of a creditor which leads him to seek security for his claim is not the equivalent of reasonable cause to believe the debtor insolvent, especially where, as here, such anxiety was not shown to exist later than some twelve to fourteen months before actual bankruptcy. Everett v. Warfield Mining Co. (4 Cir. 1930) 37 F.2d 328; Moran Bros., Inc. v. Yinger (10 Cir. 1963) 323 F.2d 699.

*Second:* The burden was upon the trustee to prove that *at the time the last two checks were paid,* International had reasonable cause to believe that the enforcement of payment would effect a preference in accordance with the criteria herein outlined. We are firmly convinced that the Trustee did not meet this burden. The Estes business enterprises were varied in scope. Many were seasonal in nature as was the fertilizer business from which this litigation developed. The Dun and Bradstreet reports admitted that Estes' financial structure was diversified and was subject to fluctuations. In the case of any business conducted on an essentially seasonal basis, conditions which exist today may rapidly change within a short space of time. One cannot say with dogmatic certainty that what existed in 1959 and early 1960 will *ipso facto* exist in late 1961. Even the fact, if it be a fact, that in 1959 or early 1960 International may have had reason to suspect that a transfer *then* would have effected a preference, is not to say that such a belief, or reasonable cause therefor, would still exist in December 1961 without cogent

proof.[3]  Grant v. First National Bank (1887) 97 U.S. 80, 24 L.Ed. 971; Nichols v. Elken (8 Cir. 1915) 225 F. 689; Charlesworth v. Hipsh (8 Cir. 1936) 84 F.2d 834.

■  The cases and authorities are uniform in holding that a showing of insolvency existing at one time does not create any presumption that it existed at a prior or subsequent time, unless the intervening period is relatively short and there is *some evidence* showing no change in circumstances.  At the time of the payments here in issue, in December 1961, the facts fail to warrant a finding of reasonable cause for belief in Estes' insolvency.  Cusick v. Second National Bank (1940) 73 App.D.C. 16, 115 F.2d 150; Dinkelspiel v. Weaver (D.C. Ark.1953) 116 F.Supp. 455; 1 Collier, Bankruptcy, Sec. 1.19(5), p. 124 (14th ed. 1964).  This is not a case where the appellant got with Estes on the eve of bankruptcy and pressured him into a transfer of the property in question. Nothing happened during the year 1961 to excite suspicion sufficient to charge appellant with the fact that it was obtaining a preference.  No connecting evidence of suspicion of insolvency was shown between the time when the post-dated checks here involved were agreed upon, and the date of the last payments due on the indebtedness.  If the post-dated checks had been returned because of insufficient funds, or had Estes requested further extensions in order to liquidate his account, or if International had received information of insolvency or been apprised of such facts as would constitute reasonable cause to believe insolvency existed, the result reached by the District Court would have been more legally compelling.  Furthermore, the record does not disclose that International closed its eyes to information it should have known about the financial condition of the bankrupt.

We conclude that International had no reasonable cause to believe that Estes was insolvent when it received payment of the last two checks to close the account in December 1961, even though the same were received within four months of the debtor's bankruptcy.  The decision of the District Court is reversed.

MARVIN JONES, Senior Judge,* United States Court of Claims (dissenting):

I agree with the District Court that the appellant (defendant below), or its authorized agents, on the date of the cashing of the two checks in issue, had

3. The following is from the testimony of the only witness in the case:
"Q.  As far as you know, had anybody with your company received any information concerning the financial condition of Mr. Estes between the period June '59 to December 1961 other than through Dun & Bradstreet?
"A.  No, sir.
"Q.  Had you talked to any of his other creditors about whether he was paying them or not?
"A.  No, sir, we did not.
"Q.  Did you ever hear anything derogatory about his financial condition during that period?
"A.  No, sir.
"Q.  Did you ever hear during that period anything derogatory about his honesty or integrity?
"A.  No, sir.
"Q.  Did you know or had you been informed or had you heard during that period that any of his assets that might have been listed anywhere—in the Dun & Bradstreet report or elsewhere—were non-existent?
"A.  No, sir.
"Q.  Did you know during the period that you were dealing with Mr. Estes anything about his general reputation among the business community?
"A.  Well, he had a very good reputation when we started dealing with him. I recall some years before he had been named as the outstanding young man of the year, I believe, by the National Junior Chamber of Commerce and was written up in Coronet magazine.
"Q.  Had he been active in other organizations?
"A.  Yes, and he had quite a following among the farmers in the Pecos area and was known more or less as a friend of the farmers in that area.
"Q.  And down and through December 1961, had you ever heard anything derogatory about him?
"A.  No, sir."

* Sitting by designation of the Chief Justice.

reasonable cause to believe that the bankrupt, Billie Sol Estes, was insolvent.

When the established facts and circumstances of record are laid alongside they substantially support the findings and conclusions that were reached by the trial court.[1]

The appellant (sometimes referred to as the "company") is an experienced business concern. It had operated for many years and had been selling fertilizer to Billie Sol Estes since 1956 or 1957. By June 3, 1959, Estes had fallen behind with his payments to the extent of $145,000. On that date, because of difficulties in collecting the account, the appellant shut off his credit and began pressing for collection of the amount already due.

During all this time W. Q. Burns was appellant's area manager in the heart of Estes' operations. Burns knew that Estes had been slow in payment for years. The company began to take steps for collection. It knew even in mid-1959 that Estes' assets were heavily mortgaged and that he was in a tight cash position. Burns had instructions from his home office to "keep pressure on him continually and to demand regular payments."

On June 1, 1958, the company secured three notes for $50,000 each covering the account to that time. Adequate payments were not forthcoming. It began to threaten "to take steps for collection" as early as May 1959. A number of letters were written. It was difficult during the next few months to get answers or even to get Estes by phone. In late 1959 the company was successful in securing 12 postdated monthly checks for $5,000 each. These checks were secured by pressing and threatening suit. The company was a good collector. By the end of 1960 the account had been considerably reduced to about $78,000. The company then secured 12 additional postdated monthly checks covering the balance of the debt with interest.

It is doubtful whether the company really contemplated suit during the period of collection. It was fearful that some of the other creditors would file suit and "throw Estes into bankruptcy." That would have destroyed the chance to collect the remaining checks and would have made it necessary to list them as claims to be paid on a proportionate basis with the general creditors of Estes. A suit by the appellant would have had the same effect. That they did not want. The company preferred to nurse the situation along and get all the cash it could while the ship was still afloat.

W. Q. Burns had been with the company for 35 years. He had handled credits for the company or supervised the handling of credits for more than 20 years. He was wise in that field. He was on the ground and was watching everything. He was no novice. With the exception of the $8,000, he collected the entire amount with interest. He put it all into what amounted to a sealed pouch which could not be reached because it was collected more than four months prior to the filing of the bankruptcy petition. The $8,000 was also collected but it was collected within the four months' period. The latter amount is involved in this suit as an alleged preference.

It is true Mr. Burns testified that he did not know at the time the last sum was collected that Mr. Estes was insolvent. But the admissions in his testimony and statements in his several previous letters, his skill in pressing for collection while carefully avoiding suit and many other facts and circumstances show that he had reasonable cause to believe Estes was insolvent.[2] He had the

---

1. Mayo v. Pioneer Bank & Trust Co., 297 F.2d 392 (5 Cir. 1961).

2. On February 22, 1960, Mr. Burns had written one of the company officials a letter from which I quote:
"I took the position * * * that if we had notes of farmers that were due

to him [Estes], in our possession and assigned to us, we would be much better off in case anything happened to him and his business blew up. * * *
"With the $10,000 payment on November 10 and $5,000 on January 10 and February 10, we are now $20,000 better off than we were. We * * * will not

last report of Dun & Bradstreet which stated that the conditions were so confused they could not make any determination as to Estes' financial status.

Burns requested a statement or financial report from Billie Sol Estes. He did not receive it directly but it was furnished to Dun & Bradstreet and reached appellant in due course of business in late 1960. That statement shows that in one of the main counties of operation Estes had listed certain properties which were stated as subject to mortgages totalling $3,000,000. The mortgages however totalled $10,000,000. The items listed showed that amount but the sum was totalled in the report as only $3,000,000. A mere glance at these figures would have shown the manifest error. Perhaps Burns did not look at them.

Perhaps he did not want to see them. But can a man be permitted to close his eyes to the sea of facts all around him? He might not have known. But to my mind the facts show clearly that he had reason to believe or at least if he had opened his eyes there were sufficient facts available to him to put any reasonable man on inquiry. These facts certainly would have revealed the true condition. Marks v. Goodyear Rubber Sundries, 238 F.2d 533, 62 A.L.R.2d 770 (2 Cir. 1956); Security-First Nat. Bank of Los Angeles v. Quittner, 176 F.2d 997 (9 Cir. 1949); Canright v. General Finance Corp., 35 F.Supp. 841 (D.C. E.D.Ill.1940), aff'd 123 F.2d 98 (7 Cir. 1941); 4 Remington on Bankruptcy 334, Sec. 1708.1 (Rev.Ed.1957). There is no indication anywhere in the record that the representative of any other creditor was closer to the base of operations than the appellant, or was in any better position to know the true facts.

These facts and circumstances do not sink to the level of a mere suspicion, but rise to the dignity of knowledgeable facts that were readily available.

I cannot say that I blame Mr. Burns. It is as natural for a man to look after his own interests as it is for the sparks to fly upward. As it begins to appear that a business is becoming shaky creditors begin to rush to collect. Each tries to get as much as he can as quickly as he can. It is somewhat like one United States Senator remarked when he was being chided for voting against his party's policy on a rather important question: "When one is on a leaking vessel in a storm and the water reaches the main deck, it is every man for himself."

This is merely a contest between creditors. The Federal Government steps into any wild scramble and says that no creditor may secure a preference over other creditors within four months previous to the actual filing of a bankruptcy proceeding, if he knew or had reasonable cause to believe that the debtor at the time of the preference was insolvent. This is a just law, a fair law and undertakes to treat all creditors alike. Some of the creditors were less fortunate in their collections. The appellant collected most of the debt through skilled operation. Probably it had a more alert repre-

sell him again under any condition. * * I still believe he will work out and that we will get all of our money eventually unless someone sues him for a sizable amount and throws him into bankruptcy. So far he has been able to avoid that. But the fear that that might happen is the reason we have requested the collateral notes so that we would have at least something to fall back on in the event a suit was filed or that he went into bankruptcy for other reasons." [Exhibit PX-8.]

This was written more than 2 years before bankruptcy, which indicates a full knowledge of the situation, or at least a realization that conditions were very uncertain—and a cool determination to sit tight and collect all the remaining eleven postdated monthly checks, if possible.

On February 24, 1960, Burns received a reply from an official of the company. I quote:

" * * * I believe, as you do, that we will eventually collect our money provided there is no bankruptcy brought about by a suit for a sizeable amount or other reasons. In order to improve our position in case of such an eventuality, I strongly recommend that you exert all possible pressure on Mr. Estes * * *." [Exhibit PX-9.]

sentative on the job. This is not a criticism, merely a comment.

In my judgment the record shows that appellant, at the time the last two checks were cashed, had reasonable cause to believe that Estes was insolvent.

I would affirm the decision of the District Court, and I therefore dissent.